# THE STATE ex rel. CROW, Attorney-General, Appellant, v. DENNIS CANTY et al.

### Division One, November 27, 1907.

1. **PUBLIC NUISANCE: Injunction: In Circuit Court: By Attorney-General.** An injunction suit, in the name of the State at the relation of the Attorney-General, to enjoin a continuing public nuisance, is properly brought in the circuit court of the county where the nuisance is maintained.

2. ———: **What Is?** Any act which is an offense against the public order, common good and public decency or morals, or any public exhibition which tends to corrupt the morals, to disturb the peace or the general good order and welfare of society, is a public nuisance, as are all exhibitions the natural tendency of which is to pander to vicious and disorderly members of society.

3. ———: **Bull-Fight.** A public bull-fight, at which men and ferocious bulls are made to fight with each other, bulls are baited and men are injured, in the presence of large gatherings of people, is a public nuisance.

4. ———: ———: **Swords: Punishment of Animals.** And the fact that *matadors* are not armed with swords does not make it any the less a nuisance, but rather makes it more so, for danger to the men is thereby increased, in that their power to defend themselves is lessened. Nor does the immunity of the bulls from punishment in any manner or degree lessen the interest of the State in the lives and limbs of men engaged in a struggle with the infuriated beasts.

5. ———: ———: **Presence of Lawless Persons.** Among the greatest evils connected with bull-fights, in an inclosed arena, is their natural tendency to draw large crowds of lawless, vicious, criminal and turbulent persons to that one center, and the consequent contaminating effect upon the youth of the locality. And where they are held in a great city, at the time of a great exhibition, those evils are greatly enlarged.

6. ———: **Injunction.** A court of equity has authority to enjoin the continuance of a public nuisance.

7. ———: ———: **Crime.** A court of equity will not undertake to enforce the criminal law; therefore, it will not enjoin the commission of a threatened act, which, if committed, would

be only a crime. But it has power to enjoin a public nuisance, and if the threatened act is a public nuisance a court of equity will enjoin it, although the act besides being a nuisance is also a crime.

8. ———: ———: ———: **Trial By Jury.** A man who has not yet acted, but who proposes to commit an act which is not only criminal in its character but also flagrantly offensive as a public nuisance, has no constitutional right to commit the act in order that he may thereafter enjoy the constitutional right of a trial by jury.

9. ———: ———: **Corporation and Individuals.** Where a corporation is guilty of hatching and maintaining a public nuisance, to-wit, public exhibitions of bull-fighting and bull-baiting, a court of equity not only has jurisdiction to enjoin it from continuing that nuisance, but also its agents and employees, the individual men and women, who masquerade as bull-fighters, and use the corporate premises to create and maintain the nuisance, and that whether or not the things they do are crimes and they may be punished as criminals.

10. ———: ———: **Property Rights.** It is not necessary that property rights must be involved in order for a court of equity to give injunctive relief. That rule has no application to proceedings to abate a public nuisance. Irreparable injury to public morals is as grave a concern to a court of equity as irreparable injury to property.

Appeal from St. Louis County Circuit Court.—*Hon. John W. McElhinney,* Judge.

REVERSED AND REMANDED (*with directions*).

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for appellant.

(1) The action was properly brought in the circuit court of St. Louis county, in the name of the State and at the relation of the Attorney-General. State ex rel. v. Zachritz, 166 Mo. 307; State ex rel. v. Stobie, 194 Mo. 48; 1 Beach on Injunctions, secs. 351-5. (2) A court of equity has jurisdiction to restrain and enjoin existing or threatened public nuisances. 2 Story's Equity Jurisprudence, secs. 921, 923, 924; 4 Pomeroy,

Equity, sec. 1349; 21 Am. and Eng. Ency. Law, 703; Joyce on Law of Nuisances, sec. 409; Harrelson v. Railroad, 151 Mo. 482; Mugler v. Kansas, 123 U. S. 672; Springfield v. Railroad, 69 Mo. App. 514; Attorney-General v. Jam. Pond Aq. Corp., 133 Mass. 361; United States v. Debs, 64 Fed. 724; People v. St. Louis, 48 Am. Dec. 339; Com. v. McGovern, 75 S. W. 261. (3) In order to sustain the jurisdiction of a court of equity, it is not necessary that property rights be involved, or that the State have a pecuniary interest in the subject-matter of the litigation. State ex rel. v. Zachritz, 166 Mo. 314; Cooper v. Hunt, 103 Mo. 17; Com. v. McGovern, 75 S. W. 266. (4) There was no remedy at law by criminal action against the defendant corporation which owned and knowingly leased the premises, and it stands admitted on the record that all of the defendants were present taking part in the performance. Com. v. McGovern, supra.

*T. J. Rowe, Thomas J. Rowe, Jr.,* and *Henry Rowe* for respondents.

The allegations of the petition fail to show any injury to property or invasion of civil rights irreparable in its nature and which cannot be redressed at law. The purpose of all civil suits is to afford relief from pecuniary loss. If there is no pecuniary loss there can be no civil suit. It is an axiomatic proposition that relief by injunction is granted to prevent irreparable damage. If no damage results from the commission of an act or the omission to perform some duty, injunctive relief can not be granted. Injunction is a civil remedy and its purpose and aim is to reach out and cover cases where the remedy at law is inadequate and incomplete. The aim and purpose of all civil remedies is to either cure or prevent pecuniary loss. Schubach v. McDonald, 179 Mo. 163. Procedure at common law cures pecuniary loss and procedure in

equity by injunction prevents pecuniary loss. If the
commission of a crime produces pecuniary loss and the
offender threatens to continue to commit same, then the
commission of the crime can be enjoined, not because it
it is a crime, but because of pecuniary loss that is in-
cident to its commission, and by reason of the irrepara-
ble damage which would result from its continuous
commission. Not a single case can be found where relief
by injunction was granted to restrain the commission
of an offense which caused no pecuniary loss. A court
of equity will not interfere in a doubtful case until
plaintiff's rights are established at law. Harrelson v.
Railroad, 151 Mo. 500. In re Debs, 158 U. S. 584, does
not militate against the above doctrine, and the decis-
ion of Chief Justice FULLER in 56 Fed. 674, supports
and sustains same. World's Columbian Exposition
v. United States, 56 Fed. 674; State ex rel. v. Zachritz,
166 Mo. 313. The cases which sustain this proposition,
namely: State v. Uhrig, 14 Mo. App. 413, and State
v. Schweickardt, 109 Mo. 496, have never been over-
ruled, but on the contrary are approved. State ex rel.
v. Zachritz, 166 Mo. 307. See Columbia Athletic Co. v.
State ex rel. Malone, 143 Ind. 109; 180 Ill. 109; 35 Wis.
425; 128 N. Y. 341; 84 Ala. 115; 48 L. R. A. 420.

WOODSON, J.—This is an equitable proceeding
instituted by the State ex rel. the Attorney-General in
the circuit court of St. Louis county, for the purpose of
enjoining respondents from giving a public bull-fight
performance in an arena prepared for that purpose,
upon the premises of the Beredith Realty Company, in
said county, near the World's Fair Exposition, which
was at the time in progress. A trial was had, and the
finding was for respondents, and a decree was rendered
dissolving the temporary injunction theretofore enter-
ed and dismissing the bill. In proper form and in due

time the Attorney-General appealed the cause to this court.

The petition was substantially as follows: That the defendants had, on divers occasions, unlawfully and wilfully managed and conducted, and proposed to continue to manage and conduct a public exhibition and performance, known as a bull-fight and bull-baiting, in an arena constructed for that purpose, in St. Louis county, State of Missouri, near the city of St. Louis; that at such performances many thousands of people attended, being each charged an admission fee of fifty cents; that great publicity was given to such performances by advertising in the public press to induce the people to attend, and that it is the intention of the defendants to unlawfully continue to conduct and use such place so constructed, as aforesaid, for the purpose of fighting and baiting bulls. That the defendant, the Beredith Realty Company, a corporation, owns the premises upon which said arena is constructed, and unlawfully, knowingly and wilfully suffer and permit the defendants to use and occupy said premises for the purpose of fighting and baiting bulls in the presence of a large number of people, and that it is the intention of defendants to continue such performances and to use said premises for that purpose for a long time to come; that if such exhibitions continue, it will seriously endanger the lives of the participants, and that it will bring together from all parts of the country, lawless, violent, turbulent and dangerous assemblies of many thousands of people, causing riots and affrays and seriously endangering the safety and lives of many people, to the prejudice of the good name and general welfare of the people. That the bull-fighting and bull-baiting so carried on, and threatened to be carried on, is contrary to the good morals and public peace and general welfare of the people of the State, and constitutes a continuing violation of law, and is a public

nuisance; that such performances are a continuing nuisance, and that the State has no adequate remedy at law, except by the interposition of the injunctive power of a court of equity. The petition concludes with a prayer for injunctive relief against the defendants.

The answer is a general denial.

There is but little if any dispute regarding the facts of this case. Those established by the State are substantially as follows:

The St. Louis Humane Society was back of and responsible for this proceeding, and the various members thereof were the principal witnesses on behalf of the State. An arena was constructed for bull-fighting, in St. Louis county, near the Administration entrance to the World's Fair grounds, and was about 150 or 200 feet square, inclosed, with a seating capacity of four or five thousand. Above the entrance was a picture of a bull, and a large sign with these words, ''Bull Fight Arena,'' and near one corner of the arena there was a poster displaying the following words: ''Bull Fight Arena. A death-defying spectacle.'' Prior to the institution of this suit several performances had been held in the arena by respondents, and they intended and threatened to continue giving them for an indefinite period of time; the first of which was on Sunday afternoon, September 4, 1904, all of which were the same in character, differing only in detail; and for that reason a statement of the facts regarding one performance will apply equally well to all. That performance was as follows:

The first part of it was a parade around the arena; the bull-fighters went in dressed in Spanish costumes, leading horses, and, after retiring, one of the respondents opened a gate and let in a bull, and he came in on the run and jump; there were several men standing around, dressed for the occasion, called matadors, with

red cloaks or capes; as soon as the bull entered he made for one of those men, and the man threw his cloak in his face and jumped away, and then every one of them went through the same performance; after the bull and men had completed that part of the performance one of the men would take a cane and go through the form of killing it, as with a sword in a Spanish or Mexican arena, but the bull was not in fact stabbed, killed or injured by that act. The action of the matadors greatly excited and maddened the bull, and he would rush around the arena after those people, and attempted to gore them, and he caught one of them and smashed him with his head and horns against the side of the arena—he looked pale as if hurt and he then disappeared and never appeared again in the arena. He told one witness he was quite seriously hurt and was attended by a physician. There were "escapes" constructed of posts and boards in various parts of the arena, behind which the matadors could and did dodge when too closely pursued by the bulls, and the man who was injured was trying to get behind one of them when caught by the bull.

Mr. Robert, another matador, was also struck by a bull at the same performance, and knocked to the ground and was in great danger of being killed or injured by the bull when the other matadors came to his timely assistance and distracted the attention of the bull. Robert, afterwards, stated to the witness that he was black and blue from the effects of the stroke of the bull. This bull was kept in the arena fifteen or twenty minutes, and after he was taken out two more were brought in; they came rushing in the same way as the first one, and charged the matadors in the same way, and "came very near catching several of them." All the bulls did all they could to catch the men, but only the first succeeded in doing so. They would rush against the "escapes" in trying to gore the men.

The fourth animal turned in was an "old black steer" with one of his horns broken and hanging down and bleeding. When he was brought in two men were dressed up like horses, and he charged them, and they caught him by the broken horn, and he would strike the "escapes" with same in his charges, which would make it bleed worse. Another man came into the arena with a barrel around his body and the bull charged and knocked him down, but did him no injury—he was rescued by his fellow performers. The bulls were greatly infuriated and would snort and bellow when charging the men.

There were twenty of the bulls. They came from the ranch of Louis Terriers, Socorro, Mexico, and were fighting bulls. Terriers raises bulls for fighting purposes and none other.

Mrs. Marian Cerevera, the wife of a bull-fighter, who went to St. Louis to make a contract for her husband with the Richard Norris Bull Fight Company to give bull-fights, testified: that the performance were genuine bull-fights, except the bull was not killed at the end of the show, as is done in Spain and Mexico; that she saw a man by the name of Sanandares pinned against the fence; he was down on his knees when some of the bull-fighters came to his rescue; they had a crazy fellow, he was brought there with my husband's company because he was crazy, and he would go up to anything; he was in a horse made out of a basket, and he rode up to the bull, he was knocked down by the bull and he was unable to rise, and the bull tried to charge him, but he was taken away by the bull-fighters. I think the bulls were doped, judging from the appearance of the animals. On cross-examination, she testified that she tried to stop the bull-fighting and went to see the Governor about it; that the reason she wanted it stopped was because "these same people have murdered my husband; three or four of them got my hus-

band in a room and had another man—if they hadn't murdered my husband, they would not be allowed to give as many bull-fights as they saw fit, so far as I am concerned; if my husband had been living I would have put a stop to it, if I could.'' Mr. Roberts came to me at my place of business in ''Creation'' and told me if I interfered with the bull-fight, he would bring Carlton Bass, the man who murdered my husband, here and have him work here in St. Louis. That was said because he thought it would make me feel badly to see the man who killed my husband.

On Sunday evening a crowd of women, bare-headed, entered the arena, with short aprons on, yelling and hollowing. They met a lot of Mexicans and they were yelling and throwing their hats up and the women were yelling—two of them were selling beer in Dreamland and the German village. There were from twelve to fourteen hundred people who witnessed the performance on that Sunday evening, many of whom were excited and yelled and hollowed and threw their cushion seats into the arena, and two men used vulgar language and the sheriff made them stop.

There were men on the outside of the inclosure advertising the sight by calling through a megaphone, and over the entrance was the following: ''Bull Fight Arena,'' and on the north side was the following: ''Felix Robert, Celebrated French Matador. Troupe of 40 Experts. Thrilling, Exciting, Unique. 20 Real Imported Wild Spanish Bulls. Death-Defying Spectacle. Arena at Administration Entrance to World's Fair, near Skinker Road. Admission 50 cents. Opening performance Sunday, September 4th. Labor Day, September 5th.''

The defendants' evidence did not tend to materially contradict the evidence introduced by State, but tended to show that the crowd was composed of good people and was orderly and well behaved; that it did

not become any more excited or demonstrative, or hollow any more than the crowds which generally witness a first class base-ball or foot-ball game. That there was no disturbance or breach of the peace. That before the trial of this proceeding took place the State had arrested and tried several of the defendants upon criminal charges, and that all of them had been duly acquitted.

I. It is too well settled to challenge discussion that the suit was properly brought in the circuit court of St. Louis county, in the name of the State at the relation of the Attorney-General. [State ex rel. v. Zachritz, 166 Mo. 307; State ex rel. v. Stobie, 194 Mo. l. c. 48; 1 Beach on Injunctions, sec. 351-5.]

II. The contention of the Attorney-General is that the defendants were maintaining and conducting, and threatened to continue to maintain and conduct a public nuisance, and with keeping and using the property and premises where such nuisance was maintained and threatened to use it for such purpose; and he further contends that such nuisance should be abated and enjoined by a court of equity, because the nuisance is an offense against public order, the common good and public decency and morals. The defendants contend that the petition does not state facts sufficient to entitle plaintiff to the relief prayed for, and that under the evidence and proof the decree of the trial court was for the right parties.

Those respective contentions present the two propositions to be decided:

First: Is a bull-fight such as the one described by the evidence a common or public nuisance within the meaning of the law?

Second: If so, has a court of equity jurisdiction to interfere by injunction and prevent it; or should the State be driven to the criminal law for redress?

This brings us first to the consideration and determination of what is a public nuisance within the meaning of the law.

Mr. Joyce, in his valuable work on the Law of Nuisances, section 5, defines a public or common nuisance in the following words: "A public or common nuisance is an offense against the public order and economy of the State, by unlawfully doing any act or by omitting to perform any duty which the common good, public decency or morals, or the public right to life, health, and the use of property requires, and which at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons; even though the extent of the annoyance, injury or damage may be unequal or may vary in its effect upon individuals. Another factor in defining a nuisance is, that consideration should be given to the places where the public have the legal right to go or congregate, or where they are likely to come within the sphere of its influence." And in section 409, the same author says: "A disorderly and disreputable theatre is a common nuisance and so is a prize fight."

1 Wood on Nuisances (3 Ed.), sec. 68, says: "A public exhibition of any kind that tends to the corruption of morals, to a disturbance of the peace, or of the general good order and welfare of society, is a public nuisance. Under this head are included all puppet shows, legerdemain, obscene pictures, and any and all exhibitions, the natural tendency of which is to pander to vicious tastes, and to draw together the vicious and disorderly members of society."

According to these definitions any act which is an offense against the public order, common good and public decency or morals, or any public exhibition

207 Sup.—29

which tends to corrupt the morals, to disturb the peace or the general good order and welfare of society, is a public nuisance; such as puppet shows, legerdemain, obscene pictures, disorderly theaters and prize fights, and *all and any exhibitions the natural tendency of which is to pander to vicious and disorderly members of society.* [Reaves v. Oklahoma, 13 Okla. 396; Com. v. McGovern, 116 Ky. 212, 75 S. W. 261.]

According to the evidence in this case there can be no doubt but what the bull-fights in so far as the bulls were concerned were genuine fights and partook of the ferocity and brutality which has ever characterized them in Spain and Mexico. Two matadors were knocked down and injured more or less by the bulls the first night, and might have been seriously injured or killed had it not been for the timely arrival and assistance of their associates; and two others were knocked down, one of them a crazy man, but both escaped injury, through the assistance of their fellows.

While it is true the evidence discloses that the matadors did not use the sword, as is the practice in Spain and Mexico in such fights, nor inflict injury or death upon the bulls, yet that very fact made it more hazardous and dangerous for the matadors. If they had been furnished with swords they would have been more able to have stopped the mad career of the infuriated bull, and thereby escaped the deadly charge of the Socorro brute, without relying exclusively upon the timely arrival and prompt assistance of their fellow matadors, or the convenient "escapes" erected along the wall of the arena.

The managers in disarming those poor bull-fighters and placing them in the arena with those mad bulls were almost if not quite as guilty of as great a crime as the Romans were in ancient times, who threw the criminals and Christians into the public arena with the wild beasts to be torn to pieces and killed by them for the

edifice and amusement of the morbid and vicious populace.

To-day the matadors have modernized the arena and reduced the fighting largely to a science, and when properly armed they can defend themselves with some degree of safety, but when disarmed they are placed back on an exact plane and equality with the unfortunate Romans, except they have the "escapes" behind which they may retreat if they are quick and dexterous enough to evade the swift and mad charge of the infuriated bull; otherwise he must share the same gory fate as the Romans of old, if perchance some associate does not in the nick of time divert his attention from him by a red flag. But in either event and under the most favorable circumstances and when the matadors are properly armed with swords they are often killed or injured, as every one knows as a matter of history and common knowledge.

The State is deeply interested in the lives and well being of all her citizens, and of those who come within her borders, and much more so than she is in the lives and safety of the bulls. The immunity of the bull from punishment under the system of fighting as shown by the evidence in this case in no manner or degree lessened the interest of the State in the lives and limbs of the men who were engaged in those highly dangerous combats and struggles. But in the case at bar one of the steers injured and broke one of his horns, which hung down over his face, and in that condition, with blood flowing therefrom, he would charge and recharge the men and dummy horses, and strike the broken horn against the dummy or the "escapes" and thereby caused the flow of the blood to increase, which must have been very painful and no less cruel to the dumb brute.

This is not all; the evidence shows that one man was killed in some controversy regarding the exhibi-

tion. While his widow does not make a very favorable impression upon us as a witness, yet as she was not contradicted, we must conclude that three or four of the men got him in a room, and while in there one of them killed him. She said murdered him, but, however that may be, it shows that there were some vicious and dangerous men gathered there and that they killed a man, and when charged with murder it did not make sufficient impression upon them to call for an explanation on their part.

The Supreme Court of Kentucky, in passing upon a prize-fight, said: "If the fight had occurred, doubtless it would have attracted some of the better and law-abiding class of citizens, curious to see such a spectacle as a prize-fight; but for every such reputable citizen thus attending there would have been present a dozen gamblers, confidence men, bunco steerers, or pickpockets, gathered from all parts of the United States, men of idle, vicious and criminal habits and practices, whose business is to prey upon the public in some form or other, and many of them would remain in the community after the combat to ply their nefarious callings. Such an assembly would easily be led into a riot, or other unlawful disturbance of the public peace. In addition to the evils suggested, there would be the contaminating effect of such a meeting upon the youth of the city and State, which might prove of incalculable injury to their morals and future welfare. Such a gathering, too, would demand increased vigilance in the protection of the property of the city and its inhabitants, be a menace to good order, and disturb the peaceful pursuits and happiness of citizens who would be unwilling to patronize such an enterprise." [Commonwealth v. McGovern, 116 Ky. l. c. 236.]

And among the greatest of the evils connected with the holding of the bull-fights, in the arena, would be the

presence of large crowds of lawless and turbulent men from all parts of the country. And what was said by the Kentucky court regarding the prize fight applies equally as well and forcible to bull-fights. "An injunction against the use of the building advertised as the place of the fight would go far toward preventing the assembling of this crowd, and thereby avert incalculable mischief, which could not well be averted by the criminal courts, or their ministerial officers, after the assembling of the audience at the place of the combat, or in the act of assembling." [Commonwealth v. McGovern, 116 Ky. 1. c. 237.]

The same sentiments and views may be truthfully said of bull-fights. It would have the natural tendency to draw the vicious and criminal elements from all over the country to that one center, and their power for evil and the commission of crime in a great city like St. Louis with her thousands upon thousands of visitors at the World's Fair, could not be foreseen or estimated, and the evil influences thereof would not have been confined to the limits of the city of St. Louis, but would have followed the youth of the country to the confines of the nation.

As it was, the fair proved to be a great attraction for the criminal element, and if they could have found so hospitable a rendezvous as the arena doubtless it would have been filled with a large class of lawless and desperate men and women, who would have been a danger and menace to the city and State, and would have endangered the public peace and safety and might have resulted in riot and bloodshed.

"These are rights, though not susceptible of a pecuniary estimate, which it is the duty of the State to protect by every means at its command." [Commonwealth v. McGovern, supra, 235.]

In treating of disorderly houses, Mr. Wood, in his excellent work on the Law of Nuisances (3 Ed.),

vol. 1, section 37, says: "So, too, a disorderly house is a common nuisance, and while bawdy-houses legitimately come under this head, yet it embraces a large class of other houses, kept for entirely different purposes, and to constitute which prostitution need not be an element."

In section 38 he says: "A disorderly house is any place of public resort in which unlawful practices are habitually carried on, or which become a rendezvous or place of resort for thieves, drunkards, prostitutes, or other idle, vicious and disorderly persons, who gather there to *gratify their depraved appetites, or for any purpose;* for such persons are regarded as dangerous to the peace and welfare of the community, and their presence at any place in considerable numbers is always a just cause for alarm and apprehension. . . . And a place where liquor is sold under a license in excessive quantities, whereby persons become intoxicated, and where brawls result therefrom, is a disorderly house, and indictable as a nuisance; for no person has a right to carry on upon his own premises or elsewhere, for his own gain or amusement, any public business *clearly calculated to injure and destroy public morals, or to disturb the public peace."*

All the authorities to which we have been cited confirm the doctrine above announced, and many more we have investigated are to the same effect. And if we are to be governed by those authorities, we are unable to see how it can be logically contended that an arena erected for the purpose and in which bull fighting is actually carried on, as disclosed by this record, is not a public and a common nuisance. We so believe it to be and have no hesitancy in declaring it to be such.

III. The second contention of the respondents is that even though it be conceded that the arena was a public nuisance, yet a court of equity has no jurisdic-

tion to abate the nuisance by injunction, but must resort to criminal prosecutions of the persons who maintain and conduct the nuisance.

The learned counsel for respondents, it seems to us, misconceives the position of the State upon that proposition. There are two offenses charged in the bill; one for maintaining a disorderly house, and the other for maintaining a public nuisance therein. While the injunctive remedy is prayed against both, yet the principal object of the bill is to abate the disorderly house by enjoining the owners thereof from permitting it to be used for the purposes named in the bill.

We have no hesitancy in holding that the individual members of the company who conducted the bullfights cannot be enjoined from so doing, because that is a crime which is punishable by conviction under the criminal laws in a criminal prosecution. Nor has a court of equity, in the absence of statutory authority, jurisdiction to enjoin the maintenance of a bawdyhouse, or any other house not of a public character.

In the discussion of this very question the Supreme Court of Kentucky in the case of Neaf v. Palmer, 103 Ky. l. c. 498, said: "It is not alleged that there are offensive sights or sounds about the obnoxious premises, but only that the property is made less valuable in the vicinity, and that the moral atmosphere is tainted and pestilential. The injury is wholly consequential. It seems to us under these circumstances criminal courts had best be left to enforce the criminal laws. These are confessedly adequate for the purpose of suppressing such evils."

And the same court in the case of Commonwealth v. McGovern, supra, on page 238, in discussing the Neaf-Palmer case, supra, used this language: "There was nothing in the case, supra, to indicate that the bawdy house complained of could not be suppressed

by the ordinary methods appertaining to the criminal court, and the damages resulting to the plaintiff's property from the existence of the bawdy-house being wholly consequential and speculative, it would, of course, have been improper in that case to employ the writ of injunction in aid of the mere property rights of the individual.''

The apparent and what actual conflict that may exist between the authorities upon this proposition grows out of the failure to draw the distinction between private and public nuisances. The offense must not only be a nuisance, but must be of a public character, which affects the entire community or a large portion of it, and conducted at a place where the public have a right to go and congregate. It never was the law, in the absence of legislative authority, that courts of equity could enjoin the commission of crime generally. [Crawford v. Tyrrell, 128 N. Y. 341.]

This court has uniformly held that a court of equity has no jurisdiction to enjoin the commission of a crime, but that resort must be had to the criminal courts, which possess ample power to punish and prevent crime. [State ex rel. v. Schweickardt, 109 Mo. 496; State ex rel. v. Zachritz, 166 Mo. 307; State ex rel. v. Uhrig, 14 Mo. App. 413.]

But the power and jurisdiction of a court of equity to enjoin the maintenance of a public nuisance is of a very ancient origin and is a well-established doctrine.

Judge Story, in treating this question, said: ''In regard to public nuisances, the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights or property.'' [2 Story's Equity Jurisprudence (13 Ed.), sec. 921.] And in section 923 the same author says: ''In cases of public nuisances,

properly so called, an indictment lies to abate them and to punish the offenders. But an information also lies in equity to redress the grievance by way of injunction." And he further says in section 924: "The ground of this jurisdiction of courts of equity in case of purpresture as well as of public nuisances undoubtedly is their ability to give more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, and also to suppress oppressive and vexatious litigation. In the first place, they can interpose where courts of law cannot, to restrain and prevent such nuisances as are threatened or are in progress, as well as to abate those already existing. In the next place, by a perpetual injunction the remedy is made complete through all future time; whereas an information or indictment at the common law can only dispose of the present nuisance, and for future acts new prosecutions must be brought."

Mr. Pomeroy states the law as follows: "A court of equity has jurisdiction to restrain existing or threatened public nuisances by injunction, at the suit of the Attorney-General of England, and at the suit of the State, or the people, or municipality, or some proper officer representing the commonwealth, in this country." [4 Pomeroy's Equity Jurisprudence (3 Ed.), sec. 1349.]

And Mr. Joyce says: "A disorderly and disreputable theatre may be enjoined although a common nuisance. So may a prize fight." [Joyce on Law of Nuisances, sec. 409.]

In discussing the power and jurisdiction of the court of equity to abate a public nuisance by injunction, the Supreme Court of Illinois said: "The jurisdiction of the court over the subject-matter of the suit was also undoubted. The court of chancery may grant preventive as well as remedial relief; and this may be done where the act threatened would be punishable under

the criminal laws as a nuisance." [People v. St. Louis, 48 Am. Dec. 340.]

In the case of Mugler v. Kansas, 123 U. S. 1. c. 672, the Supreme Court of the United States said: "Equally untenable is the proposition that proceedings in equity for the purposes indicated in the thirteenth section of the statute are inconsistent with due process of law. 'In regard to public nuisances,' Mr. Justice Story says, 'the jurisdiction of courts of equity seems to be of very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. . . . In cases of public nuisances, properly so called, an indictment lies to abate them, and to punish the offenders. But an information also lies in equity to redress the grievance by way of injunction.' [2 Story's Eq., secs. 921, 922.] The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of the courts of equity to give a more speedy, effectual and permanent remedy than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings.—This is a salutary jurisdiction, especially where a nuisance affects the *health, morals,* or *safety* of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury." [Also see State v. Mayor, 5 Porter (Ala.) 280; Attorney-General v. Railroad, 1 Drew. & Sm. Rep. 161; Attorney-General v. Forbes, 2 Mylne & Craig 132; Springfield v. Railroad, 69 Mo. App. 514; 21 Am. & Eng. Ency. Law (2 Ed.), 733; Attorney-Gen-

eral v. Jamaica Pond Aq. Corp., 133 Mass. 361; United States v. Debs, 64 Fed. 724.]

So we are thoroughly satisfied from both reason and authority that in a case of this character, where the nuisance sought to be enjoined is itself and in its very nature *both public* and at the same time *injurious to the public safety and good morals,* a court of equity has full power and jurisdiction to abate the existing nuisance and to perpetually enjoin the owners of the property from maintaining or conducting the same in the future.

IV.   The contention of respondents that a court of equity has no jurisdiction to abate a public nuisance where the offenders are amenable to the criminal laws of the State is not tenable, as is fully shown by the following authorities:    2 Story's Equity Jurisprudence (13 Ed.), secs. 923 and 924; Crawford v. Tyrrell, 128 N. Y. 341; People v. St. Louis, 48 Am. Dec. 340; 21 Am. and Eng. Emcy. Law (2 Ed.), 704; Attorney-General v. Jamaica Pond Aq. Corp., 133 Mass. 361; Carleton v. Rugg, 149 Mass. 550; Reaves v. Oklahoma, 13 Okla. 403.

V.   The respondents' contention that property rights must be involved in the litigation before a court of equity will grant injunctive relief has no application to proceedings to abate a public nuisance.   [State ex rel. v. Zachritz, 166 Mo. l. c. 314; Cooper v. Hunt, 103 Mo. l. c. 17; Commonwealth v. McGovern, 116 Ky. 212.]

VI.   The last insistence of the respondents is that under the evidence in the case, the finding and judgment of the trial court were for the right parties.

This contention is only partly true.   The court erred in dismissing the petition and in refusing to perpetually enjoin the Beredith Realty Company, its owners and managers, from permitting the use of its premises for the holding of bull-fights, and to that extent

the judgment is reversed and the cause remanded, with direction to the circuit court to re-instate the cause, and enter a decree perpetually enjoining the Beredith Realty Company, its owners and managers, from holding bull-fights in or upon its premises, and to re-enter the judgment in favor of all other respondents.

*Valliant, P. J.,* and *Lamm* and *Graves, JJ.,* concur in all except what is said in regard to the jurisdiction of a court of equity to enjoin an act criminal in its character; as to that their views are expressed in the two separate opinions of *Valliant, P. J.,* and *Lamm, J.* The majority of the court being of the opinion that the judgment should be reversed and the cause remanded with directions to the circuit court to enter judgment against all the defendants as prayed in the petition, it is so ordered.

## SEPARATE OPINION.

VALLIANT, P. J.—A court of equity will not undertake to enforce the criminal law, therefore it will not enjoin the commission of a threatened act merely because the act would be a crime, but, on the other hand, neither will it withhold its equitable relief in a case in which, for other reasons, it has jurisdiction merely because the act when committed would be a crime. An act displayed before a public audience which is debasing in its character, debauching in its influence on public morals and brutalizing in its effect on the spectators is a public nuisance which a court of equity has jurisdiction to enjoin and the court is not robbed of its jurisdiction merely because the act besides being a nuisance is also a crime. In such case a court of equity will give its attention to the public nuisance and ignore the criminal character of the act.

A man charged with the commission of a crime has

a constitutional right to a trial by jury, but a man who has not yet acted but who merely proposes to commit an act which is not only criminal in its character but also flagrantly offensive as a public nuisance, has no constitutional right to commit the act in order that he may thereafter enjoy the constitutional right of trial by jury.

*Lamm* and *Graves, JJ.,* concur.

## SEPARATE OPINION.

LAMM, J.—I agree with the result reached by my brother WOODSON in so far as the decree is reversed and one directed to be entered against the corporate defendant, its owners and managers; but not with the direction that the decree be re-entered in favor of the other respondents. It is not a case for making two bites of one cherry. All the respondents seem to me to be in the same boat and tarred with the same stick; all were engaged in a common enterprise in creating and maintaining a continuing public nuisance of a kind so bad that to color it by expletives would weaken the facts. What was new was low; what was old was borrowed from an age of savagery. The wholesome instincts of our people are one with the policy of our law in abominating such a spectacle.

The facts and the law make it a public nuisance, as shown by the opinion of my brother. This being so, equity should smite it as with a rod, without paltering, and spare not. I fail to comprehend how the corporate defendant can be guilty of hatching and maintaining that form of a mischief, on one hand, while other active agents in its maintenance, to-wit, the individual men and women, masquerading as bull-fighters, and who use the corporate premises to create and maintain the nuisance, on the other, go scot-free.

True it is these individuals may be guilty of violating the criminal law in some shape or form, and thus

may be amenable to punishment as for crime. True the general rule is that equity will not enjoin the commission of a crime. Therefore, in so far as the *matadors, picadors, toreadors, banderilleros, chulos* (and all the other bull-fighters, however named or labeled) are guilty of violating the criminal law, let them be charged, arraigned, tried and punished in criminal courts in apt time, due order and ancient form. But the matters complained of are not alone crimes. They are of a dual sort, and may be viewed from another point of view. Thus: in so far as these people, while committing crimes, if any, also aid, abet, sanction and participate in the creation and maintenance of a continuing public nuisance, they came within reach (and ought not to escape the outstretched arm and corrective hand) of a court of conscience; for, absent them and their doings, there is no public nuisance. Their acts unite with the acts of the other respondents to make the nuisance itself. Hence, equity should not bother itself to pick and choose between the lot—make fish of one and fowl of the other—but treat them as it finds them, viz.: bound together in a bundle as members of one body, "hail fellow, well met"—birds of a feather—voluntarily united in a joint violation of law in maintaining a public nuisance, and, hence, not divided by that law for the purpose of injunctive restraint.

Suppose the owners of the premises could not be found, or the title to the premises were cunningly hid away, must a public nuisance continue debauching public morals and breeding depravity when those whose acts are maintaining it are known and within reach?

It is argued there is no precedent. If that were so, it ought not to avail anything. The day of making precedents is not passed. If there be no precedent, the time has come to make one. But Hamilton-Brown Shoe Co. v. Saxey, 131 Mo. 212, is precedent enough. True,

irreparable injury to property rights lay at the foundation of the cause of action in the Hamilton-Brown case, but irreparable injury to public morals is certainly of as grave concern as mere dollar and cent loss; and what is said in that case, on principle, covers this.

The judgment should be reversed and the cause remanded with directions that the court below enter a decree as prayed in the bill.

*Valliant, P. J.,* and *Graves, J.,* concur in this.