210 So.2d 443 (1968)
C.E. AMERICA, INC., Appellant,
v.
Honorable Paul ANTINORI, Jr., As State Attorney, Etc., Appellee.
No. 36520.
Supreme Court of Florida.
February 7, 1968.
Adhered to On Rehearing June 13, 1968.
Charles J. Cheves, Jr., of Icard, Merrill, Cullis & Timm, Sarasota, for appellant.
Earl Faircloth, Atty. Gen., Robert R. Crittenden and Wallace E. Allbritton, Asst. Attys. Gen., for appellee.
Alan R. Schwartz, of Horton & Schwartz, Miami, as amicus curiae, for Bulls and Bullfighters of America, Inc.
WHITE, JOS. S., Circuit Judge, retired.
Appellant, as plaintiff in the Circuit Court, sought a decree declaring it to be lawful to stage a "Portugese-style bloodless simulated bullfight" for public entertainment. Upon trial on plaintiff's complaint, defendant's answer and the testimony of the witnesses, the trial judge ruled that the performance would not violate St. 828.12, F.S.A., but would violate St. 548.01, F.S.A.
Plaintiff has appealed direct to this Court because of the presence of constitutional questions.
St. 548.01, F.S.A. provides: "Any person who shall voluntarily engage in any pugilistic exhibition, fight or encounter, with or without gloves, between man and man, or in an exhibition or fight between man and bull, or between man and any other animal, for money or anything of value, or upon the result of which any money or anything of value is to be collected, acquired, bet or wagered or to see which any admission fee is charged, directly or indirectly, shall be punished by a fine of not less than two thousand five hundred, nor more than five thousand dollars, or by imprisonment for not more than five years."
St. 828.12, F.S.A., provides: "Whoever unnecessarily overloads, overdrives, tortures, *444 torments, deprives of necessary sustenance or shelter, or unnecessarily or cruelly beats, mutilates or kills any animal, or causes the same to be done, or carries in or upon any vehicle, or otherwise, any animal in a cruel or inhuman manner, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars, unless otherwise provided."
The performance which plaintiff identifies as a "Portugese-style bloodless simulated bullfight" is described in the record as follows:
"In the performances as proposed by the plaintiff, after all preliminary parades, entertainment and announcements have been completed, the arena is cleared of all people except certain men called `Toreros'. One bull is then permitted to enter the arena or ring from the corral. The animal will not have been enraged or infuriated, agitated or stimulated by any drugs, stimulants or mechanical means. As the bull enters the arena, his attention is attracted by a performer waving a brightly colored cape. The waving of a cape does not anger or infuriate the bull, but simply is used as a method of drawing his attention. The bull, following his natural inclination, will then charge and rush toward the cape the performer is holding, thereby allowing the performer to display his artistry, ability, dexterity, skill and grace, by executing ballet-like movements and postures as the bull rushes by.
The second phase of the performance will be the placement of `banderillas' (sticks with flags and multi-colored paper on one end, and a small barb at the other) into a specially made protective covering or mat on the back of the bull which is held in place by a rubber cord. The `banderillas' will be placed by a group of performers called `Banderilleros'. The protective mat into which the banderillas are placed will be several inches thick and as a barb on the end of the banderilla is only a fraction of an inch in length, it is impossible for the barb to cut, pierce, jab, lacerate, penetrate or stick the bull's skin. Several `banderillas' will be fixed in this manner as one or more performers are given the opportunity to display their footwork, skill and artistry in conformance with the movements of the animal.
The third and final phase of the performance will consist of a more extended period during which the star performer called a `Matador' displays his capework and footwork, while avoiding charges of the bull. After displaying his artistry, skill and grace, the Matador will conclude the performance by touching the back of the bull with his hand or a collapsible sword to simulate the kill that takes place at the conclusion of a real bullfight. The star performer will then turn his back on the animal, salute the crowd and receive applause. Several cattle with bells on their necks will then be released into the arena, along with certain men called `Herders'. The performing bull then naturally and immediately joins the group and leaves the ring or arena as a part of the herd to return to the pen."
Just how this idea of a "simulated" fight is going to be gotten across to the bull is not explained. At any rate, so we are informed, his concern with such matters was not recognized under the common law. Animals were possessed of no inherent right to protection from cruelty or abuse at the hand of man. However, in a more civilized society, it is now generally recognized that legislation which has for its purpose the protection of animals from harassment and ill-treatment is a valid exercise of the police power. See 4 Am.Jur.2d Animals, Sec. 27.
It follows that if this public performance of a "bloodless" bullfight results in cruelty to the bull, or danger to humanity, it falls within the purview of the statutes in question and is unlawful. On the other hand, if there is no cruelty or ill-treatment involved, *445 or danger of bodily harm, the police power of the State cannot be exercised to prevent such an exhibition.
The statement "The waving of a cape does not anger or infuriate the bull, but simply is used as a method of drawing his attention" is contrary to common sense and common experience. Statements such as this upon which appellant relies to support the conclusion that this is to be a harmless exhibition cannot qualify as "substantial evidence" since they are unreliable in the light of reason.
It is a matter of common knowledge that these bulls are bred to develop a pugnacious and vicious disposition. The acts of the performers in the bullring are designed to arouse and incite the bull's inherent fighting spirit. He is pestered and tormented into a fury. He paws the earth and bellows with rage, provoking the hoots and contemptuous laughter of the spectators. Regardless of the humor of his tormentors in the bullring, the bull is in a fighting mood. In the wild rush of fury, with blood in his eyes, he charges his tormentor, head down, nostrils distended, horns aimed, bent on destruction. The performers badger and tantalize him without end, until the poor brute is lashed into agonizing frenzy.
It is explained in the record: "In the event that any of the performers should slip and fall to the ground or otherwise be in danger, several men are standing by at all times to go to his aid. Escape gates and other safety devices will also be provided." If the bull is not enraged and there is no danger to the performers or spectators, why is it necessary to have "several men" standing by at all times to give aid, and to provide "escape gates and other safety devices"?
It is this element of risk which appeals to and arouses the morbid curiosity of the spectator. They seek the thrill of the narrow escape, the brutality of the bull, the gory spectacle. If the bull fails to show rage and violent anger the show is a "flop".
On the occasion of enjoining such an exhibition as a nuisance, its brutality was described in the case of State ex rel. Crow v. Canty, 207 Mo. 439, 105 S.W. 1078, 15 L.R.A.,N.S., 747, as follows:
"According to the evidence in this case, there can be no doubt but what the bullfight, in so far as the bulls were concerned, were genuine fighters, and partook of the ferocity and brutality which has ever characterized them in Spain and Mexico. Two matadors were knocked down and injured more or less by the bulls the first night, and might have been seriously injured or killed had it not been for the timely arrival and assistance of their associates; and two others were knocked down, one of them a crazy man, but both escaped injury through the assistance of their fellows. While it is true the evidence discloses that the matadors did not use the sword, as is the practice in Spain and Mexico in such fights, nor inflict injury or death upon the bulls, yet that very fact made it more hazardous and dangerous for the matadors. If they had been furnished with swords, they would have been more able to have stopped the mad career of the infuriated bull, and thereby escape the deadly charge of the Sorocco brute, without relying exclusively upon the timely arrival and prompt assistance of his fellow matadors, or the convenient `escapes' erected along the wall of the arena. The managers in disarming those poor bullfighters, and placing them in the arena with those mad bulls, were almost, if not quite, as guilty of as great a crime as the Romans were in ancient times, who threw the criminals and Christians into the public arena with the wild beasts, to be torn into pieces and killed by them for the edification and amusement of the morbid and vicious populace. To-day the matadors have modernized the arena and reduced the fighting largely to a science; and, *446 when properly armed, they can defend themselves with some degree of safety; but, when disarmed, they are placed back on an exact plane and equality with the unfortunate Romans, except they have the `escapes' behind which they may retreat if they are quick and dexterous enough to evade the swift and mad charge of the infuriated bull, otherwise he must share the same gory fate as the Romans of old, if, perchance, some associate does not, in the nick of time, divert his attention from him by a red flag. But, in either event and under the most favorable circumstances, and when the matadors are properly armed with swords, they are often killed or injured, as everyone knows as a matter of history and common knowledge. The state is deeply interested in the lives and well-being of all her citizens, and of those who come within her borders, and much more so than she is in the lives and safety of the bulls. The immunity of the bull from punishment under the system of fighting as shown by the evidence in this case in no manner or degree lessened the interest of the state in the lives and limbs of the men who were engaged in those highly dangerous combats and struggles. But, in the case at bar one of the steers injured and broke one of his horns, which hung down over his face, and in that condition, with blood flowing therefrom, he would charge and recharge the men and dummy horses, and strike the broken horn against the dummy or the `escapes,' and thereby caused the flow of the blood to increase, which must have been very painful, and no less cruel to the dumb brute."
Such an exhibition shocks the sensibilities of any person possessed of humane instincts. The people of the State of Florida, through their legislature, have taken a stand on the subject and the performance involved here falls within the prohibition of the statutes thus enacted.
Affirmed.
THOMAS, ROBERTS and ERVIN, JJ., and SPECTOR, District Court Judge, concur.
CALDWELL, C.J., and DREW, J., dissent.