769 So.2d 468 (2000)
Henry BRINKLEY and Linda Brinkley, Appellants,
v.
COUNTY OF FLAGLER, Appellee.
No. 5D99-241.
District Court of Appeal of Florida, Fifth District.
October 13, 2000.
*469 Michael H. Lambert, Daytona Beach, for Appellants.
David S. Morgan, Daytona Beach, for Appellee.
PETERSON, J.
Linda Brinkley, once joined by her recently-deceased husband, Henry Brinkley, appeals, inter alia, the findings of the trial court regarding her fitness and ability to adequately provide for animals, the removal of these animals from her possession, and the injunction entered enjoining her from possessing animals.
Responding to a citizen complaint that a large number of animals were being kept in unhealthy conditions and that a puppy had been sold without an accompanying health certificate, a Flagler County sheriff's deputy and an animal cruelty investigator met at the Brinkleys' farm. As they stood by the front gate, they were overwhelmed by the nauseating smell of animal waste; indeed, the front yard was covered with animal feces. They called loudly several times but failed to gain anyone's attention. The duo then entered the premises through the front gate which had been left unlocked. Approaching the farmhouse they could see that the front porch was also covered with animal feces along with the decaying carcass of a dog on top of a stack of small pet carriers and fluid from the carcass was dripping onto a live poodle inside one of the carriers. The poodle's cramped quarters lacked food and water and the dog could not straighten its legs when it was later released.
Three inches of feces and newspaper thickly lined the bottom of the animal cages stacked on the porch. Food was scattered so that it intermingled with the feces and water bowls were either tipped over or contained water that was black and foul smelling.
From the porch, the duo could see directly inside the farmhouse through the *470 open front door. The back door was also open, creating a corridor of sight through the house. The deputy renewed his call for a human response. From this vantage point, the front rooms inside the house were clearly visible. Multiple dog cages could be seen, but there was no sign of human habitation. Household garbage, trash, and animal feces littered the interior of the farmhouse which was overrun with cockroaches and rats. Dogs that were not caged were running into and out of the house through open doors.
The deputy and investigator continued to observe the filth from the porch, never entering the house. They were standing on the porch when Henry Brinkley appeared and commented that if he had been given a few days notice of the inspection, the conditions would not have been discovered.
Inside the farmhouse, a water bucket had dead rats floating in it. In one room, containing stacks of caged animals, the window was closed and there was no air circulating. A cockatiel bird, found in a cage in the kitchen crawling with roaches, was initially overlooked by the county agents because so much trash was piled on and around the cage that it was obscured from view.
Further inspection of the property revealed a second dead dog, partial canine body parts that suggested other animal deaths, and dead rats. Roaches and fleas infested the property. Roaches crawled throughout the structures, in and on the animals cages, and on the animals themselves. Roaches were found "feeding" on a puppy. Additionally, a canine litter was being born in a cage lined with feces, so that the birthing mother was cleaning both afterbirth and feces from the newborn pups.
Just as in the farmhouse, the animal waste was widespread and thick in trailers that were also used to house animals. Dog food was lying or scattered in feces rather than in bowls, and water, when there was some, was foul. Trash was piled in several places on the property in a grossly unsanitary manner and one outside kennel was so covered in overgrowth that the county agents did not know initially that there were animals housed in it. Living and dead rats were in the animal cages and rats overran the numerous structures housing the cages. The dogs were fighting the rats for food. In one trailer, the rat infestation was so bad that the walls shook with the vermin.
Initially, the County seized approximately 358 dogs and puppies and one bird. Although several deaths occurred, multiple births caused this number to grow to approximately 402 dogs and puppies at the time of the hearing that was held thirty days after the seizure, with yet more births expected.
The duo called the county animal control supervisor who arrived shortly with a veterinarian to assess the health of the dogs. Skin diseases were readily apparent and the dogs were infested with fleas. Some dogs were thin and malnourished, and others had badly matted fur or nails that had been allowed to grow so long that the nails curved under their paws, some actually penetrating the paw pads. Approximately twenty-five veterinarians were engaged to address the dogs' health maladies.
The County sought to enjoin the Brinkleys from mistreating animals again by filing a petition against the Brinkleys under section 828.073, Florida Statutes (1997). The trial court found the Brinkleys were unfit and unable to adequately provide for the animals as proscribed by section 828.073 and ordered that the animals be turned over to the Flagler County Humane Society for appropriate placement and disposition.
Linda Brinkley first contends that the trial court erred in denying her motion to suppress the testimony and photographs describing the deplorable and inhumane conditions observed during the initial inspection of the premises. She argues this evidence was obtained without a warrant *471 allegedly resulting in an illegal search and seizure in violation of her Fourth Amendment rights under the U.S. Constitution and Florida law.[1]
The animals on the Brinkleys' property were removed pursuant to section 828.073, a statute giving law enforcement officers and duly appointed humane society agents the right to provide care to animals in distress. The initial determination to be made is whether the Fourth Amendment is applicable to section 828.073. The parties agree that the Fourth Amendment applies to civil forfeiture actions, but the County contends that because no civil forfeiture action is contemplated by the statute, the Brinkleys' Fourth Amendment rights were not violated.
Generally, a forfeiture is a loss of some right or property as a penalty for some illegal act or because of breach of a legal obligation. See Black's Law Dictionary 585 (7th ed.1999). It is undisputed that the animals seized in the instant case were considered the Brinkleys' personal property. Section 828.073 provides for the removal of neglected or mistreated animals and the eventual transfer of custody to a Humane Society if the owner is deemed unable or unfit to adequately provide for them. See Fla. Stat. §§ 828.073(1)(a) & (4)(c)2 (1997). The statute further provides for the enjoinment of the owner from further possession or custody of other animals if warranted. See Fla. Stat. § 828.073(4)(c)4. Accordingly, because section 828.073 contemplates the loss of an unfit owner's right to possession or custody of his or her animal due to the neglect or mistreatment of that animal, we find that an action brought pursuant to this section constitutes a forfeiture action and is protected by the Fourth Amendment.
The issue following the determination that the Fourth Amendment is applicable is whether the warrantless entry and seizure under the circumstances of this case was constitutionally reasonable, i.e., within one of the established exceptions to the warrant requirement; specifically, the emergency exception to the warrant requirement. This emergency exception has been defined generally as follows:
Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, to render first aid and assistance, or to conduct a general inquiry into an unsolved crime, provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search.
State v. Kraimer, 99 Wis.2d 306, 298 N.W.2d 568, 572 (1980), cert. denied, 451 U.S. 973, 101 S.Ct. 2053, 68 L.Ed.2d 353 (1981) (quoting The Emergency Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buffalo L.Rev. 419, 426 (1972)); see also Tuck v. United States, 477 A.2d 1115 (D.C.1984) and cases cited therein.
In the instant case, it is undisputed that the deputy and the animal cruelty investigator did not enter the Brinkleys' property with an intent to either arrest or search; they arrived only to make a preliminary inquiry regarding a citizen's recent complaint. Upon arrival at the front gate, however, they were immediately struck by the undeniable reality of the horrid existence of inhumanity. The first thing that assaulted their senses was the overpowering and unimaginable smell of animal feces. Then there was the noise. The barking was so loud that one had to shout just to speak to someone a few feet away; a clear indication that a large number of animals were on the property. Piles upon piles of feces and trash could be seen from the gate, dogs were observed running around uncontrolled, and several *472 animal cages could be seen piled on the porch in the midst of the squalor. The distress of the animals was apparent to the deputy and the investigator, and any reasonable person would also have concluded that an urgent and immediate need for protective action was warranted. Accordingly, we find that entry onto the Brinkleys' property under these circumstances was constitutionally permitted. See generally State v. Bauer, 127 Wis.2d 401, 379 N.W.2d 895 (1985), rev. denied, 129 Wis.2d 550, 388 N.W.2d 185 (1986).
Brinkley alternatively argues that because section 828.073 fails to provide for a preliminary hearing prior to seizure, it deprived her of property without due process of law in violation of the Fourteenth Amendment to the United States Constitution and Article I, section 9 of the Florida Constitution.
Fundamental to the concept of due process is the right to be heard. See Fuentes v. Shevin, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556, reh'g denied, 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972). The right to be heard assures a full hearing before a court having jurisdiction of the matter, the right to introduce evidence at a meaningful time and in a meaningful manner, and judicial findings based upon that evidence. See, e.g., Pine v. State, 921 S.W.2d 866 (Tex.App.1996). "It includes also an opportunity to cross-examine witnesses, to be heard on questions of law, and the right to have judgment rendered after trial". Id. at 873.
In the instant case, we find that Brinkley received a full hearing on the issue of whether the animals in question should be taken from her custody within the 60 day period prescribed by statute. See Fla. Stat. § 828.073(2). She was represented by counsel, examined witnesses, and had the opportunity to offer evidence. It does not matter that this hearing was a post-seizure hearing as opposed to a pre-seizure hearing, the point being that she received a full hearing during which the validity of the County's seizure was judicially determined. Cf., e.g., Humane Society of Marshall Co. v. Adams, 439 So.2d 150 (Ala.1983); Anderson v. George, 160 W.Va. 76, 233 S.E.2d 407 (1977). We further note that if the seizure of an animal was judicially determined to be unwarranted because the owner is, in fact, able to adequately provide for the animal, then the owner cannot be required to pay for the cost of the animal's care. See Pet Fair, Inc. v. Humane Soc. of Greater Miami, 583 So.2d 407 (Fla. 3d DCA 1991). Accordingly, we conclude that Brinkley was not deprived of her property without due process, that the post-seizure hearing provided by section 828.073 adequately protected her due process rights, and that a pre-seizure hearing was not necessary.
Brinkley argues further that the statute is constitutionally infirm because it authorizes the trial court to "enjoin the owner's further possession or custody of other animals." See Fla. Stat. § 828.073(4)(c)4. We note that an injunction entered pursuant to this statute does not prohibit possession of animals "ad infinitum," as Brinkley asserts. Instead, the injunction that was entered "is subject to change, modification or termination, upon her petition when warranted by evidence that she can properly assume care of animals in a responsible manner." See generally Jackson Grain Co. v. Lee, 150 Fla. 232, 7 So.2d 143 (1942). Because legislative protection of animals from harassment and ill-treatment is a valid exercise of police power, we find Brinkley's argument of constitutional infirmity to be without merit. See C.E. America, Inc. v. Antinori, 210 So.2d 443 (Fla.1968).
Brinkley also complains that the statute is unconstitutional as applied because it fails to specify which party has the burden of proof. The statute specifically provides that "[i]f the evidence indicates a lack of proper and reasonable care of the animal, the burden is on the owner to demonstrate by clear and convincing evidence that he is able and fit to have custody *473 of and provide adequately for the animal." Fla. Stat. § 828.073(6). Brinkley asserts that the burden of proof should be on the petitioner to prove its case by clear and convincing evidence. Review of the transcript reveals that the County readily agreed to meet this burden of proof and that the court ruled that Brinkley would not lose custody of the animals unless the County could prove its case by clear and convincing evidence. Additionally, we interpret the statute to require initial proof of lack of care and it is only after that evidence is sufficiently presented does the burden then shift to the owner to demonstrate fitness. Accordingly, we disagree that Brinkley was prejudiced by the burden of proof as applied in her case.
Brinkley next attacks the language of the statute, asserting that the phrases "able to provide adequately for the animal," "is fit to have custody of the animal," and the word "unfit" are vague and overbroad. A statute cannot be found to be void for vagueness if it conveys sufficiently definite warnings of the proscribed conduct when measured by common understanding and practice. See Wilkerson v. State, 401 So.2d 1110 (Fla.1981) and cases cited therein; State v. Wilson, 464 So.2d 667 (Fla. 2d DCA 1985). We have no trouble in applying these words and phrases to determine whether Brinkley should be privileged to have custody of animals in the future.
Next, Brinkley complains that it was error to transfer the case from county court to the circuit court for a hearing on the county's motion for costs because section 828.073 clearly establishes jurisdiction in the county court. Section 828.073(2)(b) requires that the county court determine whether adequate care has been provided and whether the owner is fit to have custody of the animals. The county court fulfilled that duty. However, Brinkley overlooks section 828.073(4)(c)3, which provides: "Upon proof of costs incurred by the agent or officer, the court may require that the owner pay for the care of the animal while in the custody of the agent or officer. A separate hearing may be held." Here, the County was seeking in excess of $15,000 in costs. Because this amount exceeded the county court's jurisdiction, only the circuit court had subject matter jurisdiction over this aspect of the dispute. See generally Fla. Stat. §§ 26.012; 34.01 (1997). Accordingly, the county court did not err in transferring the cost hearing to the circuit court pursuant to Rule 1.060(a) of the Florida Rules of Civil Procedure.
Finally, Brinkley argues that the order imposing costs was untimely pursuant to section 823.073(2)(b), which provides:
[A] hearing [is] to be set within 30 days after the date of seizure of the animal or issuance of the order to provide care and held not more than 15 days after the setting of such date, to determine whether the owner, if known, is able to provide adequately for the animal and is fit to have custody of the animal. The hearing shall be concluded and the court order entered thereon within 60 days after the date the hearing is commenced.
Relying on section 828.073(2)(b), Brinkley argues that because the order imposing costs was not entered within 60 days of the hearing on care and fitness, the order is untimely and the trial court was without jurisdiction to enter it. Again she overlooks section 828.073(4)(c)3, which expressly provides for a separate hearing on the issue of costs and, unlike section 828.073(2)(b), there is no time limit established for the hearing on costs. The statute requires expedited resolution of the care and fitness issues because it would be inequitable and a violation of due process to allow the County to hold an individual's animals for an extended period without judicial determination of the appropriateness of the seizure. However, we find that determination of the cost issue does not require an expedited resolution and can be *474 addressed after the initial and predicate issues are determined.
We find no error by the trial court and affirm the judgments and orders.
THOMPSON, C.J., and W. SHARP, J., concur.
NOTES
[1] See generally Fla. Stat. §§ 828.17 and 933.20 (1997).