STATE OF IOWA, Appellant, v. BANNER HOWARD, Appellee.

No. 41639.

DECEMBER 13, 1932.

REHEARING DENIED JUNE 21, 1933.

John Fletcher, Attorney-general, and Gerald O. Blake, for appellant.

John Redmond and W. W. Crissman, for appellee.

EVANS, J.—The suit is brought by the state, upon relation of the Attorney-general, under the provisions of section 2519 of the

Code. It is conceded by the defendant that he is practicing the healing art, and has been so practicing the same for the period of twenty-one years at Cedar Rapids. His defense is that he uses neither medicine nor surgery in such practice; that he practices a system denominated by him as "Naprapathy". This system is said to have been discovered by one Oakley Smith, who is the defendant's chief witness. It is analogous in some respects to the osteopathic and the chiropractic systems, in that it is a system of manipulation of muscular tissue. Concededly the defendant has operated at all times without a license of any kind. The defendant purports to treat all so-called common diseases, including appendicitis, rheumatism, arthritis, neuritis, flus, and colds. Upon examination by his own counsel, the defendant testified as follows:

"Q. Can you tell us something of the essential differences between the methods of your treatment and chiropractic treatment, if there are any differences? In theory or practice. A. Yes.

"Q. Well, tell us some. A. We do not believe in the subluxation theory, that bones are partially displaced in the spinal column.

"Q. Will you tell the Court what subluxation is? It may be he has never heard of it before. I have heard it once or twice, but I—Tell us what that means, if you can. A. Subluxation means partial dislocation.

"Q. Of the vertebra in the spinal column? A. If it is applied to the spinal column, yes.

"Q. Now, the chiropractor replaces the vertebra, does he? A. Claims to, yes.

"Q. If the back is curved or whatever position he straightens that up? A. Attempts to, yes.

"Q. Or attempts to. Now, what is your theory about it, what do you practice? A. Our theory is that disease originates in the baser tissues of the body, such as connective tissue, especially white fibrous connective tissue, which binds and holds the bones forming the joints of the body together. And if they are in any way injured they are prone, as connective tissue always is, to thicken and shrink. And our theory is that a stretchment of the tight connective tissue structures is essential in the restoration of the normal function in the organs supplied by the nerves involved in the tightening of the tissues. And that makes the essential difference, thus, between a chiropractor and a naprapath. It would bind the vertebra closer

together, and it would create a condition the opposite of a partial subluxation or displacement, so that two vertebra would ·be more difficult to displace one from the other in this abnormal tightened condition than it would if it were normal. There would be a restricted movement.

"Q. Is it your theory that the nervous force is supplied through the vertebra to the various parts of the body? A. Through the intervertebral foramen formed by two adjacent vertebra, yes.

"Q. I had forgotten the word foramen or I would have used it. Is that the same with chiropracty? A. Essentially so, yes.

"Q. You have continued that here for twenty-one years and never done anything else? A. Yes, sir.

"Q. How many people have you treated, on an average, in a year? And where did they live, generally? A. That is quite a question.

"Q. Yes, it is quite a question. I am asking you to make an estimate of it as best you can. We know it won't be accurate, we understand that. But just an approximation. A. Oh, something around twenty-five hundred.

"Q. Do you know whether or not the medical practitioners in Cedar Rapids knew that you were treating diseases and trying to help suffering mankind in the manner you did, in all of these years? A. I think I have very definite knowledge of that, yes.

"Q. That they knew it? A. Yes, ·sir.

"Q. Yes, sir. Well, do you know whether this examining board or the State Board of Health knew it, that you were here in the—practicing Naprapathy in all of these years? A. Yes.

"Q. They knew it? A. Yes, sir.

"Q. State whether or not practitioners have actually—whether they liked to or not I don't care—turned cases or directed cases·they had been unsuccessful with to you for treatment; I mean, medical practitioners? A. Yes."

He testified also that he knew only one other practitioner of the same system in the state of Iowa. Oakley Smith was examined as a witness for the defendant. He testified as follows:

"Q. What is naprapathy, if I pronounce that right, as compared, say, with chiropracty? Can you differentiate that so the Court can get some idea of your theory and practice or treatment? A. Naprapathy is a non-medical science or profession, based on

three elements. One: discovery. The discovery that shrunken connective tissues or ligaments produce a great variety of remote ailments. Second element is invention; the invention of a method by which manipulation or exercise or motions could be symbolized in record form. And one inheritance. The same as when one might inherit money from his parent and didn't earn it. * * *

"Q. Well now, can you differentiate in short words, the difference—can you explain to the Court the difference between chiropracty and your method, in the theory of healing? A. In the broad sense of physical education chiropracty and the non-medical part of osteopathy and Swedish Movement, all belong to the non-medical and non-surgical field. From there on there are definite technical differences, such as those described by Doctor Howard, that instead of the subluxation or bone out of place the naprapath has discovered by means of laboratory instruments and precision it was a case of shrunken ligaments damaging the nerve, rather than bone damage. That made a difference in the shortening up of the number of treatments required, and, increasing the surety of cure. In other words, the difference is largely a matter of emphasis. But that same thing might be said regarding the difference between naprapathy and physical education as taught in the University of Iowa, where they treat sprains and strained ligaments and injured joints, curvature of the spine, different kinds of flat foot, weak arches of the foot; there again it is a matter of emphasis. Physical directors do that for pay without a license or any physician or surgeon around. I used to do that at Iowa City under Dad Moulton. We take pride and think we do a lot better job.

"Our school does not teach the healing of human ailments by the administration of drugs. That is outside of our theory. We teach no surgery. Our pupils are taught to treat human ailments by manipulation. I have been cured of appendicitis by Dr. Howard."

On cross-examination he testified as follows:

"I was born January 19, 1880, three miles from West Branch, Iowa, entered Iowa City in 1899 and was there that year and 1900. After I left Iowa City I ran free clinics at Clarinda, Iowa, Santa Barbara, California, and at Cedar Rapids, Iowa, for a total of nearly seven years. I finished this free clinic work in 1908. I am the discoverer of naprapathy. I might qualify that by saying that part of naprapathy was discovered and a part of it was inherited. * * *

"Q. And at Iowa City at that time how much of a course did you have there? A. You mean, medical school?

"Q. Yes. A. Four year course.

"Q. You took two of it? A. Two of it. I might explain, if you like. I—I felt that medicine was not taking me where I wanted to go.

"Q. I see. So you just went out on your own hook and started something else? A. I just went out with father's and mother's money and started to conduct clinics.

"Q. Since 1908 you have confined your activities to the school in Chicago? A. School and practice.

"Q. School and practice? A. And research work.

"Q. You say, in the last ten years you turned out about three hundred graduates? A. That would be my estimate, without having time to figure.

"Q. And at the present time you have seven instructors? A. yes, seven. Eight. Six. That varies a little, dependent on how many subjects each one of us teach.

"Q. Are they as a general rule graduates of your school? A. Yes.

"Q. Are they graduates of medical schools? A. No.

"I think Kentucky is the only state which has made a provision to permit naprapaths to take an examination where it wouldn't be all farce. That is the opinion of the naprapaths. I testified in the case of Carpenter v. State (106 Neb. 742, 184 N. W. 941) in the State of Nebraska in 1921. At that time I stated the theory treatment of naprapaths. This is not only a method of treatment of human ailments but I have cured horses. It is not limited to human ailments. It is limited to anything that has a spinal column and joints and ligaments. It is a healing art.

"One year in general medical and two years at Cook County Clinic, surgical and medical."

On redirect he testified:

"Naprapathy is a non-medical healing art. Pupils of our school were admitted to practice in Illinois. They are not now. At one time they were admitted in Indiana, Pennsylvania, California and Oregon, but they are not at the present time. No state at the present time issues licenses to naprapaths except Kentucky."

■ The foregoing is a sufficient disclosure of the contents of the record to enable an understanding of the line of defense. The emphasis of the argument is that the defendant was neither practicing, nor purporting to practice, medicine or surgery. He gave no medicine and performed no surgery. Section 2538 of the Code is as follows:

"2538. For the purpose of this title the following classes of persons shall be deemed to be engaged in the practice of medicine and surgery:

"1. Persons who publicly profess to be physicians or surgeons or who publicly profess to assume the duties incident to the practice of medicine or surgery.

"2. Persons who prescribe, or prescribe, and furnish medicine · for human ailments or treat the same by surgery.

"3. Persons who act as representatives of any person in doing any of the things mentioned in this section."

This section states the acts which are deemed to constitute the practice of medicine and surgery within the meaning of the prohibiting chapter. The point now urged by the defendant was fully considered by us in State v. Hughey, 208 Iowa 842, 226 N. W. 371. In that case no medicine was actually given nor any surgery actually practiced. Nevertheless the defendant therein purported to diagnose the ailment and to treat it by a laying on of hands. No useful purpose can be served by repeating our discussion in that case. The fact that the system used by the defendant is analogous to that of the osteopathic or of the chiropractic has no influential bearing upon the case. If he had obtained a license as an osteopath or as a chiropractor, a different question would be presented. He purports to understand the osteopathic and chiropractic systems, and purports also to improve upon them by his system. Our statute gives no recognition to such system. No recognition therefore can be given to it by the courts, nor by the administrative officers of the state. It must be deemed as a mere name and an evasion of the statute. To recognize the legality of the defendant's practice under such a name would defeat all the legislation that we have for the regulation of the practice of medicine and surgery. Admittedly the defendant maintained an office in one of the principal office buildings of the city. In the directory of the office building his name appeared as "Dr. Banner Howard". Admittedly also he purported to diagnose

the ailments of his patrons. As a witness, he purports to have studied "Diagnosis". Correct diagnosis is one of the first duties of the qualified physician. Purported diagnosis is also the first resort of the disqualified one, and the first requisite of a miraculous cure. The ailments, curable or incurable, which he professes to discover, and to cure, are such only as his own diagnosis declares. He is subject to no check other than his own judgment because his new system of naprapathy affords him a complete refuge from any critic who does not profess his system. Diagnosis as a guide to treatment is therefore clearly one of the duties of the physician. This duty the defendant has always assumed to perform. Such was the situation in State v. Hughey, supra. What we said on the subject in that case is controlling here.

We must hold, therefore, that it is not a valid defense in this action for the defendant to show that he is practicing *naprapathy*.

II. The defendant devotes considerable argument to the question of the constitutionality of the statute. That question was adjudicated against him on a former appeal. See State v. Howard, 214 Iowa 60, 241 N. W. 682. See, also, State v. Fray, 214 Iowa 53, 241 N. W. 663.

III. The defendant has pleaded an estoppel against the state and its administrative officers, in that he has been permitted to conduct his office and his practicing for the last twenty-one years. and in that he at one time applied to the Iowa board of health for a license to practice his particular system. It appears from the evidence that the following correspondence was had, consisting of a letter from the defendant to the board of health, and a reply thereto from the board of health:

"Banner Howard
"Naprapath
"Cedar Rapids, Iowa

"November 3, 1921
"Secretary of the State Board of Health,
"Des Moines, Iowa.

"Dear Sir: I desire to be examined for a license to practice as a Naprapath in the treatment of human ailments without the use of drugs, medicine or operative surgery, so that I may practice that profession as a law-abiding citizen in perfect harmony with all of the laws of the state.

"Before deciding whether I shall make such application it is imperatively necessary that I should have some important information, which is requested in the letter herewith enclosed, which letter is rather lengthy, because of the fact that I desire to inform you of such facts and matters as will be necessary for you to know in order to enable you to give me the information desired.

"Therefore I respectfully and earnestly request and will thank you for your careful reading and consideration of the letter herewith enclosed, and a reply thereto at your early convenience.

"Awaiting your reply with interest, I am,

"Very respectfully yours,"

"State of Iowa
"Department of Health and Medical Examiners
"Des Moines
"Guilford H. Sumner, M. D., Secretary-Executive Officer
"H. W. Grefe, Assistant Secretary
"Lynn V. Clemens, Chief Clerk
November 7, 1921.

"Banner Howard,
"318 Cedar Rapids Savings Bank Building,
"Cedar Rapids, Iowa.

"Dear Sir: Your letter of November 3, 1921, is received and in reply I have to say that I am sending herewith a copy of rules and regulations of the Iowa State Board of Medical Examiners, and on pages 21 to 29 you will find the medical law as amended by the 39th General Assembly. This Board is authorized to examine only those who come under the title Who Deemed Practitioner, on page 25 of the enclosed booklet, and all such applicants must comply with the requirements as given at the bottom of page 27.

"Your letter of November 3, 1921, will be placed on file for the consideration of this Board at its next meeting, for such action as may be deemed necessary.

"Very respectfully,
"Guilford H. Sumner,
"HWG                                              Secretary."

A reading of the foregoing must be deemed a sufficient answer to the contention of the defendant at this point. There was nothing in the statute then, nor is there now, that would justify the board of health in assuming to examine the defendant as to his qualifica-

tions to practice the system of naprapathy. He did not offer to submit himself to an examination as to his fitness to practice medicine, osteopathy, or chiropracty.

The judgment below must be reversed.

STEVENS, C. J., and ALBERT, KINDIG, WAGNER, and MITCHELL, JJ., concur.