259 P.2d 1033

SMITH v. STATE BOARD OF MEDICINE
OF IDAHO et al.

No. 7988.

Supreme Court of Idaho.

July 6, 1953.

Rehearing Denied Sept. 2, 1953.

E. G. Elliott and Frank Langley, Boise, for appellant.

Robert E. Smylie, Atty. Gen., and Leonard H. Bielenberg, Asst. Atty. Gen., Boise, for respondents.

Mary Schmitt, amicus curiæ, Nampa.

GIVENS, Justice.

Appellant's amended complaint in essence alleged that he has a diploma granted him December 6, 1932 by the American School of Naturopathy, New York City, conferring upon him the degree of Doctor of Naturopathy; that he is duly qualified and legally entitled to practice Naturopathy. Then it alleged on information and belief that this School was founded September 15, 1896 and was an institution of learning organized and existing under the laws of the State of New York, empowered to grant the degree of Naturopathy and was a recognized and reputable school of naturopathy. Followed by direct allegation, that the naturopathy school or system of healing is distinct from other schools or systems, such as Allopathy, Chiropractic, Homeopathy and Osteopathy, and involves the use of purely natural measures and remedies, excluding the use of drugs, narcotics, poisons and surgery and constitutes no danger, or threat of danger, to the public health, safety or welfare; that the State Board of Medicine, and the Commissioner of Law Enforcement, activating examinations for and granting of licenses to practice medicine in Idaho, refused appellant a license to practice medicine; that there is no statute providing for the licensing of a naturopath; that the Board and various Law Enforcement officers, defendants and respondents herein, threaten to prosecute appellant for continuing his practice and that such refusal and portents deprive appellant of his constitutional rights; and asks that the statute providing for the licensing of physicians and surgeons be declared unconstitutional and not applicable to appellant in his practice and that the respondents be enjoined from enforcing such statute against him.

Honorable Charles F. Koelsch, former District Judge, by agreement of the parties,

194

heard and disposed of the action as judge pro tem. under Article V, Section 12, of the Constitution.

The learned trial court found:

"IV

"That at all times from and after July 1, 1949, the date on which the complaint herein was filed, plaintiff has advertised and held himself out to the public as one who is capable of investigating, diagnosing, and treating and has offered to investigate, diagnose and treat physical and mental ailments or diseases of various persons with a view to relieving the said persons of said ailments or diseases and has suggested, recommended and prescribed means, medicines and appliances to such persons for the intended relief, palliation, or cure of such ailments or diseases;"

"IX

"That plaintiff holds no license from the State of Idaho to practice any of the various systems or schools of the healing art and that plaintiff holds no license to practice medicine and surgery issued under the provisions of Chapter 18, title 54, Idaho Code."

and concluded that claimant, since July 1, 1949, had been practicing medicine as defined in Section 54–1802(a), Idaho Code, without a license as required by law, and that no constitutional right of appellant was infringed by the act of the Board in refusing him a license (he never presented a license as a physician and surgeon from another state or applied to take or took an examination to procure a license as a physician and surgeon in Idaho) and that he is not entitled to any relief as asked for, though recognizing inferential rights.

■ This is a civil action, albeit for a declaratory judgment, and appellant as plaintiff had the burden to prove he was entitled to practice as he did without a license as a physician or surgeon.

■ We need not and do not decide whether, if appellant practiced naturopathy in such manner that what he did is not encompassed within the practice of medicine as defined in Section 54–1802(a), I.C.[1], because it is what appellant did, not what he

1. "Any person shall be regarded as practicing medicine and surgery who shall advertise in any manner, or hold himself or herself out to the public, as a physician and surgeon, or either, or who shall investigate, diagnose or treat, or offer to investigate, diagnose or treat, any physical or mental ailment or disease, real or imagined, of any person with a view to relieving the same, as is commonly done by physicians and surgeons, or suggest, recommend, prescribe or direct for the use of any person, sick, injured or deformed, any drug, medicine, means or appliance for the intended relief, palliation or cure of the same, or who shall suggest, recommend, prescribe or direct an operation on any such sick, injured or deformed person or who shall perform, or offer to perform, any such operation whether or not such person receives therefor, either directly or indi-

calls himself, which determines whether he was practicing medicine. State v. Miller, 59 N.D. 286, 229 N.W. 569, at page 571; State v. Henning, 83 Ohio App. 445, 78 N.E.2d 588; State v. Farrand, Ohio App., 105 N.E.2d 656.

Appellant himself testified he performed minor surgery, which he defined as "any surgical proceeding which might endanger the life of a patient. Any surgical procedure which might endanger the life of an individual." Also, "A. Surgery would be cutting the body. Q. —open the body? A. Yes."

He further testified he diagnosed by X-ray and gave colloidal sulphur as internal medication; that he took blood counts, and that he would use antibiotics, including Hydrangea, astringents and botanical preparations of many kinds.

Section 54–1802, I.C., makes no distinction between major and minor surgery and appellant's statements bring his acts within the scope of the statute as showing he practiced surgery without a license to do so, under the authorities hereafter cited.

Title 21 U.S.C.A. § 321(g) defines drug as follows:

"(1) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia

of the United States, or official National Formulary, or any supplement to any of them; and (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any article specified in clause (1), (2), or (3); but does not include devices or their components, parts, or accessories."

Section 37–204, Idaho Code, thus defines drug:

"The term 'drug' as used in this chapter shall include all medicines and preparations recognized in the United States pharmacopoeia or national formulary for internal or external use in force at the time the drug is prepared, sold or offered for sale, and any substance or mixture intended to be used for the curing, mitigation, or prevention of disease of either man or other animals, whether said drug be simple, mixed or compounded. * *."

and Section 37–2202, Idaho Code, thus:

"(a) 'Drug' means (1) articles recognized in the official United States

rectly, any fee, gift or compensation of any kind whatsoever or in any manner whatsoever: Provided, however, that the definition of the practice of medicine and surgery as defined above shall not be construed to include the practice by any person of a healing art which is a system

or mode of treating the sick or afflicted which is, or may hereafter be, licensed under the laws of this state if the person practicing such healing art holds a license from the state entitling him to engage in the practice of such healing art, * * *."

Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, official National Formulary, New and Nonofficial Remedies, or any supplement to any of them, intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man; and (2) all other articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man; and (3) articles (other than food) intended to affect the structure *of* any function of the body of man; and (4) articles intended for use as a component or any articles specified in clause (1), (2), or (3); but does not include devices or their components, parts, or accessories."

If it be urged the statutory definitions of drug are applicable only to the particular statutes in which they occur, such statutory definitions do not differ from the general legal definitions of drug, State v. Baker, 229 N.C. 73, 48 S.E.2d 61, at page 66.

Webster's New International Dictionary, 2d Ed.(1935) thus defines drug:

"Any substance used as a medicine, or in making medicines, for internal or external use; * * * a narcotic substance or preparation." p. 791.

Appellant introduced in evidence, which was admitted generally and without limitation, Blakiston's New Gould Medical Dictionary, 1st Edition, published in 1949 by the Blakiston Company, Philadelphia-Toronto, which thus defines sulphur:

"A solid, nonmetallic element. Occurs as a yellow, brittle mass or in transparent monoclinic or rhombic crystals and exists in a number of modifications. It is insoluble in water, slightly soluble in alcohol and ether, and soluble in carbon disulfide."

and defines colloidal sulphur:

"This form of sulfur may have some therapeutic action analogous, when injected intravenously, to that of foreign protein injections. Colloidal sulfur is available on the market under a number of trade names."

The American Illustrated Medical Dictionary, Dorland, 17th Ed., W. B. Saunders, 1935, defines sulphur thus:

"A nonmetallic element existing in many allotropic forms, and asserted by some to be a compound: * * *."

The 21st Ed., p. 343 (c/f 1274S) defines colloidal sulphur as—

"* * * an iron oxide preparation used intravenously in severe infections."

■ We are justified in considering colloidal sulphur a *drug* under Section 54-1802, Idaho Code.

Gould, supra, defines Hydrangea:

"The dried rhizome and roots of Hydrangea arborescens; contains a glycoside hydrangin. Hydrangea has been used as a diuretic and antilithic." Dorland, supra, defines Hydrangea—

"A genus of saxifragaceous trees and shrubs. The root of H. arborescens is diuretic."

Dorland, supra, defines diuretic as follows:

"Increasing the secretion of urine. A medicine that promotes the secretion of urine."

Webster's Dictionary, supra, defines Hydrangea:

"* * * 3. The dried rhizome and roots of the wild hydrangea (hydrangea arborescens), used as a diuretic."

We do not find Hydrangea listed anywhere as an antibiotic, but it evidently is a drug.

██ Gould, supra, defines an astringent as:

"1. Causing contraction; binding. 2. An agent that produces contraction of organic tissues, or that arrests hemorrhages, diarrhea, etc."

Dorland, supra,—

"Causing contraction and arresting discharges. 2. An agent that arrests discharges. The principal astringents are silver nitrate, tannic acid, gallic acid, lead acetate, zinc sulphate, catechu, Kino, alum, and dilute mineral acids."

The listed astringents are drugs, and appellant did not restrict his use thereof.

Gould, supra, defines antibiotic thus:

"1. Pertaining to antibiosis. 2. Tending to destroy life; designating the extracts of certain organisms employed against infections caused by other organisms—that most commonly used is penicillin. 3. An antibiotic substance."

Dorland, 21st Ed., supra, 1948, p. 117, defines antibiotic as follows:

"1. Destruction of life. 2. Pertaining to or characterized by antibiosis. The term antibiotics is given to antibacterial substances of biologic origin. They are derived from bacteria (pyocyanase, pyocyanin, Tyrothricin); from actinomyces (actinomycetin, actinomycin, streptothricin, streptomycin); from molds and fungi (penicillin, citrimin, gliotoxin, fumigatin, fumigacin, claviformin, flavicin, flavicrin and others); from natural substances other than micro-organisms (lysozyme, chlorellin, canavalin, allicin)."

Collected papers of the Mayo Clinic and the Mayo Foundation, Vol. 44, 1952, W. B. Saunders Co., p. 668, thus characterizes and enumerates antibiotics:

"By definition an antibiotic is a substance of biologic or microbal origin that possesses antibacterial activity."

and lists on page 669 antibiotic agents in current use as: Bacitracin, Tyrothicin, Gramicidin, Polymyxin A and B, Penicillin,

Streptomycin, Chloramphenicol, Aureomycin, Terramycin, Neomycin and Viomycin.

Taken as an example of an antibiotic, because given in Gould, supra, sodium penicillin is listed in the U. S. Dispensatory, 24th Ed., Lippincott, 1947, p. 830, which contains an extended dissertation thereon stating:

"Penicillin is used in the treatment of infections due to susceptible (penicillin sensitive) organisms. The dosage and the routes and schedules of administration are determined by the sensitivity of the bacteria concerned and the location of the infection. The uses of penicillin are multitudinous. The therapeutic indictions of both the parental and oral administration of this *antibiotic* (emphasis ours) substance are continuously under investigation."

The U. S. Pharmacopoeia, 13th Rev., Mack Pub. Co. 1947, pp. 382–383, defines Pencillin calcium as the "calcium salt of an *antibiotic* substance or substances * *." (Emphasis added.)

Physicians Desk Reference to Pharmaceutical Specialties and Biologicals, 1953, 7th Ed., published by Medical Economics, Inc., Rutherford, New Jersey, page 612, under current usage of antibiotics in infections, lists: Penicillin, Streptomycin and Dihydro-Aureomycin, Chloramphenicol and Terramycin.

De re Medicia, Lilly & Co. 1951, under Antibiotics, states:

"In recent years, efforts have been made to identify as many antibiotics as possible and to determine which of them might be of value as local or systemic anti-infectives. Not all antibiotics are capable of being used as anti-infectives. Some act against certain nonpathogenic organisms, but are inactive against pathogens; others are effective in vitro, but not in vivo. The clinical value of some very potent antibiotics is likewise limited by their extreme toxicity at therapeutic blood concentrations."

As to the potential toxicity, see also Collected Papers Mayo Clinic, supra, and Vol. 42, 1950, p. 686; 143 Am. Med. Ass'n Journal, June 10, 1950, p. 520.

Botany is defined by Webster's New International Dictionary (1935) p. 314, thus:

"1. The science of plants; the branch of biology dealing with plant life. Botany, in its broadest sense, comprises many subordinate sciences, each with a distinctive terminology. The most important of these are: morphology, treating of form and structure (often only the external form); anatomy or histology, of internal structure; cytology, of the cell; physiology, of life processes; paleobotany, of fossil plants; ecology, of

the relationship between plants and their environment; taxonomy or systematic botany, of plant classification; phytogeography, of plant distribution; pathology, of plant diseases; genetics, of plant breeding and heredity. * * Applied, or economic, botany deals with the uses of plants to mankind, and with their products, as drugs, fibers, rubber, wood, etc.; thus, forestry, pharmacognosy, horticulture, agriculture, etc., fall in greater or less degree within its province. * * * Since 1890 researches have added much to the knowledge of plant physiology, morphology, cytology, ecology, and pathology, which had been subordinated to taxonomic study."

■ Clearly, antibiotics are within the meaning of "drug" in Section 54–1802, Idaho Code, and appellant's use of these drugs is interdicted by Section 54–1802, I.C.

Dr. Popma testified he is a licensed physician and surgeon and radiologist specialist, diagnosing and treating with X-ray and radium, and, in effect, that such science of radiology is comprehended within the general practice of medicine and surgery.

■ The conclusion is inevitable, therefore, that appellant in performing sur-

gery—though classified by him as only minor—using drugs, and diagnosing by use of X-ray, was, as found by the learned trial court, practicing medicine and surgery without a license; therefore, he was violating the law. State v. Sawyer, 36 Idaho 814, 214 P. 222; People v. Fowler, 32 Cal. App.2d Supp. 737, 84 P.2d 326; Millsap v. Alderson, 63 Cal.App. 518, 219 P. 469; Cooper v. Board of Medical Examiners, Cal.App., 207 P.2d 844; People v. Mangiagli, 97 Cal.App.2d Supp. 935, 218 P.2d 1025; Powers v. United States, 75 U.S. App.D.C. 371, 128 F.2d 300; People v. Dennis, 271 App.Div. 526, 66 N.Y.S.2d 912; State v. Henning, 83 Ohio App. 445, 78 N.E.2d 588, supra; Kuts-Cheraux v. Wilson, 71 Ariz. 461, 229 P.2d 713, at page 716; State v. Houck, 32 Wash.2d 681, 203 P.2d 693; Perry v. Larson, D.C., 25 F.Supp. 728. Also, see Oosterveen v. Board of Medical Examiners, 112 Cal.App.2d 201, 246 P.2d 136, sustaining the ultimate holding herein, though failing to note the difference in the statutes here and in California,[2] which eviscerates the criticism of the learned trial court, 246 P.2d at page 142, in sustaining the demurrer herein.

We adhere to and approve the principles announced in State v. Fite, 29 Idaho 463, 464, 159 P. 1183, and State v. Armstrong, 38 Idaho 493, 225 P. 491, 33 A.L.R. 835, as

2. "Sec. 5. Section 2232 is added to said code, to read: 2232. The classification of drugless practitioner is abolished but all persons holding licenses as drugless practitioners may continue to engage in practice and to renew their licenses annually." Business and Professions Code (Cal.), 1949 Session Laws, Chap. 233, page 458.

the learned trial judge did in correctly overruling the general demurrer on the theory the amended complaint alleged healing practices not proscribed to one not holding a license to practice medicine and surgery, chiropractic or osteopathy and such thought is inferentially recognized in the judgment herein. The proviso in the 1949 amendment to Section 54–1802, I.C.,[3] does not abrogate the holding in the above cases, but appellant's own evidence makes the doctrine of those cases inapplicable and unavailing herein.

We need not and do not pass on what constitutes permissible practice of naturopathy or define what naturopathy is, further than as indicated above in connection with the ruling on the general demurrer, principally because that is primarily a legislative prerogative and also on the record herein and authorities submitted, we could not with sustainable accuracy judicially forecast or determine what hypothetical acts may or may not encroach upon or come within the orbit of the cognate and pertinent restricted professional and technical fields now regulated and licensed by statute.

█ Appellant presents no authority which holds a statute, requiring a person to be reasonably qualified and to have a license before he can practice medicine and surgery, is unconstitutional and the law is to the contrary. Barton v. Schmershall, 21 Idaho 562, 122 P. 385; 70 C.J.S., Physicians and Surgeons, § 6, page 826.

If appellant wants to practice, as he testified he has been doing, he will have to procure a license as a physician and surgeon, as required by Title 54, Chapter 18, Idaho Code.

The judgment is, therefore, affirmed. Costs awarded to respondents.

PORTER, C. J., and TAYLOR, THOMAS and KEETON, JJ., concur.

---

3. "* * *: Provided, however, that the definition of the practice of medicine and surgery as defined above shall not be construed to include the practice by any person of a healing art which is a system or mode of treating the sick or afflicted which is, or may hereafter be, licensed under the laws of this state

if the person practicing such healing art holds a license from the state entitling him to engage in the practice of such healing art, * * *." 1949 S.L., Chap. 23, p. 29.