STATE of Missouri ex rel. William A. COLLET, Prosecuting Attorney of Jackson County, Missouri, Plaintiff-Appellant,

v.

William SCOPEL, Defendant-Respondent.

No. 46212.

Supreme Court of Missouri,

Division No. 2.

Sept. 8, 1958.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 13, 1958.

William A. Collet, Pros. Atty., in and for Jackson County, and Joe E. Burris, Kansas City, for appellant.

Thomas M. Howell, Kansas City, Byron O. Dye and Edwin H. White, Kansas City, of counsel, for respondent.

BARRETT, Commissioner.

This is a civil action in equity instituted on behalf of the State by the Prosecuting Attorney of Jackson County, acting in his official capacity [Section 56.060],[1] to enjoin the unlicensed practice of medicine by defendant, William Scopel, on the ground that such practice is "a continuing public nuisance detrimental to the public welfare and dangerous to the public health, contrary to and against the public policy of the State." Upon this appeal by the State from the decree of the trial court dissolving the temporary restraining order theretofore issued and dismissing plaintiff's petition, the fact that the State is a party to the action [State ex rel. Thrash v. Lamb, 237 Mo. 437, 141 S.W. 665] invokes our appellate jurisdiction under Article 5, Section 3, Mo.Const. of 1945, 2 V.A.M.S.

Defendant admittedly has neither sought nor obtained a license to practice medicine in this State [see Sections 334.010, 334.030 and 334.040, as amended Laws of 1951, p. 727], but his contention is "that he is a naturopath and as such does not practice medicine and that his business is not subject to the licensing or control of any board or agency under the laws of Missouri." Defendant's loose definition of naturopathy is "*a system of medicine* that utilizes properties required by the body to bring about a natural reaction—that is as near as possible that we define ourselves." (All emphasis herein is ours.) Illustrative of the statutory definitions of naturopathy, in those states in which that system of medicine has been recognized by legislative enactment, is the Florida definition in Section 462.01, F.S.A.: " * * * (T)he use and practice of psychological, mechanical and material health sciences to aid in purifying, cleansing and normalizing human tissues for the preservation or restoration of health, according to the fundamental principles of anatomy, physiology and applied psychology, as may be required. Naturopathic practice employs, among other agencies, phytotherapy, dietetics, psychotherapy, suggesto-therapy, hydrotherapy, zone therapy, bio-chemistry, external ap-

1. Unless otherwise specifically stated, all statutory references are to RSMo 1949, V.A.M.S.

plications, electrotherapy, mechanotherapy, mechanical and electrical appliances, hygiene, first aid, sanitation and heliotherapy * * *." Although naturopathy is sometimes said to be a drugless system of healing, the South Carolina Naturopathic Physicians Association alleged, in an action for a declaratory judgment, "that it is essential in the practice of their profession * * * to administer and prescribe such drugs" as opium and its derivatives, aminopyrine, barbiturates and penicillin [Dantzler v. Callison, 1955, 227 S.C. 317, 88 S.E.2d 64, 66], and licensed naturopaths in Florida stubbornly and successfully sought the right to prescribe narcotic drugs. State Dept. of Public Welfare v. Melser, Fla., 69 So.2d 347, 353; In re Complaint of Melser, 160 Fla. 333, 32 So.2d 742. See also Perry v. Larson, 5 Cir., 104 F.2d 728.

Defendant in the case at bar operates at 1410 Central in Kansas City, Missouri, "a school of naturopathic medicine" which he calls the American College of Naturopathic Medicine and Laboratory Technic. At the same address, defendant has "my clinic" which, as he says, "I must have" in connection with the "school." According to defendant, his "institution is under the supervision of a medical director" and "we have five doctors there all the time." Neither the "medical director" nor any of the "five doctors" testified, but defendant identified the medical director as M. A. Elstein, M.D., "an old gentleman" who "spends most of the time there." Defendant is "part of the clinic" and maintains a large office there, with his name inscribed on the door as *Dr. William Scopel, N.D., Dean Diagnosis.*" His office furnishings include "a standard examination table * * * used by all physicians" and a number of glass cases containing surgical instruments and what appear to be "pills and other medicine." One witness, a practical nurse, recognized in defendant's office specula for vaginal examinations and instruments for swabbing wounds and pulling sterile gauze from containers, and defendant readily admitted his use of a

stethoscope and "a cardiograph machine"— "I had the first one ever made."

The insistence of defendant, whose practice obviously was not drugless, that "everything that was prescribed from that clinic that required the prescription by a physician, it was so done by said physician" finds no independent support in the record. On the contrary, the evidence persuasively indicates that defendant, in fact, prescribed although he sometimes did so over the signature of his "medical director." After one female patient (gathering evidence for prosecution of this suit) had been examined by defendant, he gave her a prescription for phenobarbital bearing Elstein's signature. When cross-examined concerning this prescription (*before* the patient had testified or had been identified), defendant first said that "I handed it to *him* (the patient), but it was written by the medical director; he was right there when I gave it," then surmised "I suppose he was," and finally conceded "I don't recollect." When recalled to the stand *after* the patient had testified, defendant remembered that Elstein "was in the next room and, at the time I could not take him before a patient, because he was unable to come * * * his urine and his odor was unpresentable," so *"I took the finding of the diagnosis to* Dr. Elstein, and he wrote this prescription which I handed to *this woman, according to the diagnosis that I gave to him."*

When this same patient returned to defendant's office about ten days later, "he asked me (the patient) some questions and took my blood pressure and listened to my heart and told me I was in perfect condition"; but, notwithstanding the patient's "perfect condition," defendant gave her a small box labeled "Caroid and Bile Salts with Phenolphthalein"—"Physician's Sample," which contained three brown tablets—"a laxative to take in the evening," and a dark bottle filled with a liquid and bearing a label with the handwritten direction, "(1) *teaspofull* after meal." Defendant said that the brown tablets actually were "Feenamint, sent out by the com-

pany, and everyone that comes into my clinic I give them one"; and, in response to the incredulous query, "whether they need it or not," defendant blandly assured his cross-examiner, "yes, a good physic doesn't hurt anyone." According to defendant, the bottle of liquid was "merely a tonic made up of licorice and iron and stuff like that * * * more or less of a fruit substance," which "anybody can take * * * anytime" and which is beneficial "in general for everything." The patient paid defendant $5 on each visit.

Defendant recognized, as having "been in my office," a small bottle bearing the typewritten label "Acetanalid—3 Grain" which, however, contained (so he said) "pure aspirin." He thought that he had given the bottle and its contents to a female patient from Independence, who "come in with migraine headaches, and the way she acted and the line that she told me (defendant), I realized *she was someone who a thousand times a year were sent to me*, and I took the aspirin out of that bottle." Defendant also identified on cross-examination an unsigned prescription blank on which he had written "Permajute of Potassian Cristal." Insisting that "it is properly spelled," he conceded that permanganate of potash crystals were intended, agreed that "evidently I have given it to someone (unidentified in the record) a long time ago," but could not say for what purpose he might have recommended the use of such crystals—"permanganate is used for a million and one things."

Clarence E. Holt, a naturopath called as a witness for defendant, had occupied an office adjoining that of defendant. Holt bluntly stated that "all naturopath doctors are specialists in the laws of nature to take care of any disease in the human body," definitely asserted that naturopaths "diagnose conditions of the human body and disease"—"that is part of naturopathy," and readily agreed that it likewise is "part of naturopathy, certainly," to prescribe treatment for any condition found. Then, in response to an inquiry whether "you

know of your own knowledge, by reason of your office association with him * * *, he (defendant) did do those things," Holt answered, "I have reason to think so."

Among the exhibits, we find (1) defendant's "main book," a paper-bound pamphlet of fifty-four pages titled "Scopel's Natural Antibody Theory," written by defendant, *"Degrre* N.D., M.D.—Dean of the American College of Natural Medicine and Laboratory Technic, Kansas City, Missouri," and copyrighted, revised and reprinted in 1952, (2) an eight-page pamphlet bearing the same title, with an author's foreword by "William Scopel, M.D." and (3) a ten-page pamphlet of invective captioned "It Happened To Me" which identifies the author as "Dr. Wm. Scopel * * * Discoverer of Natural Immunization, Degree N.D., M.D., Registered to practice medicine in the State of Oklahoma," and "Dean of the American College, etc." Defendant caused the first two pamphlets to be distributed "to the people engaged in the field of healing" and the last one "to the public."

 It is clear that, for protection of the public health and welfare, the legislature is empowered to regulate the practice of medicine in such manner as it reasonably may believe to be proper and wise. State v. Smith, 233 Mo. 242, 265–268, 135 S.W. 465, 471–472, 33 L.R.A.,N.S., 179; State v. Davis, 194 Mo. 485, 499–501, 92 S.W. 484, 488–489, 4 L.R.A.,N.S., 1023; Dent v. State of West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623. In the valid exercise of such authority, our general assembly has seen fit to require that "(a)ll persons desiring to practice medicine or surgery in this state, or to treat the sick or afflicted," shall furnish satisfactory evidence of certain educational qualifications and shall attain a specified average grade upon medical examination conducted by the State Board of Medical Examiners [Section 334.040, as amended Laws of 1951, p. 727], and has made it unlawful for any person, other than a registered physician (and those exempted by Section 334.150), "to practice medicine or

surgery in any of its departments, or to profess to cure and attempt to treat the sick and others afflicted with bodily or mental infirmities." Sections 334.010 and 334.030. The general assembly has recognized and made appropriate provision for the licensing of chiropodists in Chapter 330, chiropractors in Chapter 331, dentists in Chapter 332, nurses in Chapter 335, optometrists in Chapter 336, osteopaths in Chapter 337, and pharmacists in Chapter 338. None of the rights or privileges of naturopaths have been infringed or denied by reason of the fact that they have not been accorded similar legislative recognition by name, for the general assembly is under no duty or compulsion to recognize and deal with every school of medicine and to provide for the licensing of the followers of each such school by requiring of them only such education or knowledge as that particular school may demand. Hahn v. State, Wyo., 322 P.2d 896, 901; Schlichting v. Texas State Board of Medical Examiners, Tex., 310 S.W.2d 557, 563–564; Hitchcock v. Collenberg, D.C.Md., 140 F.Supp. 894, 899, affirmed 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718. Our statutes do not prohibit the practice of naturopathy, but the general assembly has, in Chapter 334, established certain requirements which must be met and satisfied by any person (not exempted by Section 334.150) who undertakes the practice of medicine. One so licensed to practice may, if he desires, apply the tenets and principles of naturopathy in his practice. Dantzler v. Callison, 230 S.C. 75, 94 S.E.2d 177, 187(16), appeal dismissed 352 U.S. 939, 77 S.Ct. 263, 1 L.Ed.2d 235; Davis v. Beeler, 185 Tenn. 638, 207 S.W.2d 343, 347, appeal dismissed 333 U.S. 859, 68 S.Ct. 745, 92 L.Ed. 1138; Louisiana State Board of Medical Examiners v. Fife, 162 La. 681, 111 So. 58, 54 A.L.R. 594, affirmed 274 U.S. 720, 47 S.Ct. 590, 71 L.Ed. 1324.

■■ In determining the initial question as to whether defendant is engaged in the practice of medicine within the contemplation and meaning of Chapter 334, we are interested in what he does, not what he calls himself or his system of practice [State v.

Smith, supra, 233 Mo. loc. cit. 260, 135 S.W. loc. cit. 469; State v. Blumenthal, 141 Mo. App. 502, 505, 125 S.W. 1188, 1189; Smith v. State Board of Medicine of Idaho, 74 Idaho 191, 259 P.2d 1033, 1034–1035(2)]; and if, in fact, defendant is practicing medicine, he cannot escape the consequences by cloaking his activities under the pseudonym of naturopathy. For, since naturopathy has not been recognized by our general assembly, it cannot be recognized by our courts. State v. Howard, 216 Iowa 545, 245 N.W. 871, 873–874(2); 92 A.L.R. 174. Contrast Williams v. Capital Life & Health Ins. Co., 209 S.C. 512, 41 S.E.2d 208, 210. And, it may be added that defendant's legal position is not altered or improved by the fact (if so) that there was a medical doctor in his clinic and that he (defendant) issued prescriptions signed by such doctor. State v. Young, Mo.App., 215 S.W. 499, 501(7).

■■ Without undertaking judicial definition of what constitutes the practice of medicine in Missouri, it may be said that the obvious intention of Chapter 334 is to embrace " 'any person who habitually holds himself out as a professor of the art of healing' " [State v. Smith, 233 Mo. loc. cit. 263, 135 S.W. loc. cit. 470; Davidson v. Bohlman, 37 Mo.App. 576, 579]; that the prescription of drugs is not essential to the practice of medicine [Stribling v. Jolley, 241 Mo.App. 1123, 1136, 253 S.W.2d 519, 524; State v. Evertz, Mo.App., 202 S.W. 614; Davidson v. Bohlman, supra]; and, that diagnosis (in which defendant purports to be especially qualified and particularly proficient) is an important and integral part of the practice of medicine. State v. Smith, supra, 233 Mo. loc. cit. 258–260, 263, 135 S.W. loc. cit. 468–470; State v. Howard, supra, 245 N.W. loc. cit. 874; State ex rel. Shenk v. State Board of Examiners in Basic Sciences, 189 Minn. 1, 250 N.W. 353, 354. Defendant's practice encompassing, as it does, diagnosis and treatment of the sick, we have no doubt but that it constitutes the practice of medicine within the contemplation and meaning of Chapter 334. State v.

Smith, supra; State v. Young, supra; State v. Fenter, Mo.App., 204 S.W. 733; State v. Evertz, Mo.App., 202 S.W. 614, 616; Davidson v. Bohlman, supra. Consult also O'Bannon v. Widick, 281 Mo. 478, 220 S.W. 853, affirming Mo.App., 198 S.W. 432. This conclusion as to naturopathic practice is in accord with the overwhelming weight of authority in other jurisdictions. See Hahn v. State, supra, 322 P.2d loc. cit. 900–901, and cases there collected.

However, defendant argues that, regardless of whether he is practicing medicine, injunctive relief should be denied because (so he says) the State failed to prove that he is, in fact, a public nuisance. Unlicensed medical or dental practitioners have been enjoined in many jurisdictions, usually pursuant to statutory authorization [Schlichting v. Texas State Board of Medical Examiners, supra; State ex rel. Board of Medical Registration & Examination v. Hayes, 228 Ind. 286, 91 N.E.2d 913; Dean v. State, 233 Ind. 25, 116 N.E.2d 503; Nighohossian v. State, 75 Ariz. 162, 253 P.2d 344, 346; State v. Fray, 214 Iowa 53, 241 N.W. 663, 81 A.L.R. 286; State v. Howard, 214 Iowa 60, 241 N.W. 682; State ex rel. Corley v. Leopold, 170 Kan. 613, 228 P.2d 538; State ex rel. Beck v. Cooper, 147 Kan. 710, 78 P.2d 884, 888; Louisiana State Board of Medical Examiners v. Lensgraf, La.App., 101 So.2d 734, 736; Board of Medical Examiners of Utah v. Blair, 57 Utah 516, 196 P. 221; State Board of Dental Examiners v. Rymer, Tenn., 303 S.W.2d 959; State v. Boren, 42 Wash.2d 155, 253 P.2d 939, 944] but sometimes as a public nuisance per se without specific statutory declaration or authorization. Kentucky State Board of Dental Examiners v. Payne, 213 Ky. 382, 281 S.W. 188; Commonwealth ex rel. Attorney General v. Pollitt, 258 Ky. 489, 80 S.W.2d 543; Curtis v. Registered Dentists of Oklahoma, 193 Okl. 233, 143 P.2d 427. See also Taylor v. State, Okl., 291 P.2d 1033, 1041, appeal dismissed 352 U.S. 805, 77 S.Ct. 33, 1 L.Ed.2d 38; Board of Examiners in Veterinary Medicine of State v. Tubbs, Okl., 307 P.2d 830, 832; Weber v. Florida State Board of Optometry, Fla., 73 So.2d 408. Other cases support the contention of instant defendant that, since at common law the practice of medicine was open to any who desired to follow it, subject only to liability for damages resulting from lack of skill and to the right of the government by quo warranto to prevent incompetents from following the profession [Aitchison v. State, 204 Md. 538, 105 A.2d 495, 497–498 (2), certiorari denied 348 U.S. 880, 75 S.Ct. 116, 99 L.Ed. 692; Redmond v. State, 152 Miss. 54, 118 So. 360, 367; State v. Borah, 51 Ariz. 318, 76 P.2d 757, 758(1), 115 A.L.R. 254], unlicensed medical practice does not now constitute a nuisance per se, may not be restrained on a mere showing that the practitioner has no license, but should be enjoined only upon the further showing that such unlicensed practice, in fact, constitutes a public nuisance. People ex rel. Bennett v. Laman, 277 N.Y. 368, 14 N.E.2d 439; State ex rel. La Prade v. Smith, 43 Ariz. 131, 29 P.2d 718, 92 A.L.R. 168, modified on rehearing 43 Ariz. 343, 31 P.2d 102, 92 A.L.R. 173; State ex rel. Marron v. Compere, 44 N.M. 414, 103 P.2d 273, 275.

Defendant's theory that his practice is not a public nuisance because he is (as his counsel phrases it) "educated beyond the bare minimum prescribed by the statute he is accused of violating [Section 334.040(2)], and unchallenged and unimpeached in his competence in the limited system (of naturopathy) which he admittedly practices" prompts a brief review of the evidence concerning his education and qualifications to treat the sick. Before coming to this country in 1915, defendant went through the fifth or sixth grade in school in his native land of Italy—"that is as far as we could go there" —and in a private school conducted by his brother took what his counsel liberally construes to have been "a course of study * * equal to high school." After "a very short course" at the Palmer-Gregory Chiropractic College in Oklahoma City, he received a diploma from that institution in 1922; and, on a date not fixed in the record, he became "the president of the school," a position still

held by him at the time of trial. Although defendant thought that he had been "licensed under the old Indian Territory Laws" in 1925 "to administer remedies under the Indian Laws," and that he was "a herb doctor in Oklahoma"—"under the Territory Law, yes," and although he said that he had "my certificate of registration," he did not produce it, and we are mindful that the Indian Territory had become the State of Oklahoma in 1907, long before defendant landed in this country. But, if defendant's status as "a herb doctor in Oklahoma" remains cloudy and obscure, he established that he was " 'a corn doctor' " [State ex rel. Flickinger v. Fisher, 119 Mo. 344, 353, 24 S.W. 167, 169, 22 L.R.A. 799] in that state by offering in evidence an Oklahoma license to practice chiropody, which had been issued to him in 1935.

In 1930, defendant obtained from The National College of Massage and Physio-Therapy in Chicago a certificate that he had "completed a prescribed course in Health Culture and (had) passed a creditable examination in the art of Scientific Swedish Massage, Medical Gymnastics, Electro-Therapy, Hydro-Therapy, Swedish Face and Scalp Treatment, Hygiene and the underlying principles of Anatomy and Physiology." And, after a one-year "night course" in "eclectic medica"—"a system of medicine utilizing all of the natural substances * * * barring metallic substances"—the Dearborn College of Physicians and Surgeons in Chicago issued a diploma to defendant in 1941 purporting to confer on him the degree of Doctor of Medicine. Having volunteered on direct examination that "Dearborn College is one of the oldest medical schools, perhaps, in the United States," defendant conceded on cross-examination that "it closed in 1947." There is no suggestion that defendant was licensed to practice any system or branch of medicine in Illinois.

Defendant said that, in 1941, he "spent nine months at the Gradwal School of Medical Technology in St. Louis" but no diploma or certificate from that institution was presented. At the conclusion of a one-year "rotating internship," defendant obtained in 1943 a Certificate of Internship from Corning Research Hospital in Corning, Arkansas, an institution which also had closed prior to the time of trial. During this period of "internship," defendant lived in Kansas City, Missouri, going to Corning "sometimes three and sometimes four days a week" and at the same time caring for "my business here (in Kansas City), making a living." He described his "business" as "taking care of displaced Japanese sent here from the West Coast to be placed in industry" and as "general director * * * of the United Shoe Workers." In August, 1948, the Missouri Naturopathic Association was incorporated; and, during the same month, the Board of Naturopathic Examiners of that Association issued to defendant a certificate bearing, among others, the signature of defendant, president of the Association, identified as "N.D., D.C., M.D." Compare Aitchison v. State, supra, 105 A.2d loc. cit. 496–497, 500. Under date of January 15, 1952, the Booker T. Washington Chiropractic College in Kansas City, an institute "for the G. I. colored boys," issued a diploma to defendant certifying his completion of "4,320 class hours." According to defendant, he attended this institute "for four years in night school"—"they had such wonderful instructors there, and I wanted to get all that I could out of it." In March, 1955 (after institution of this suit), defendant procured from the Georgia Board of Naturopathic Examiners a license authorizing him to practice naturopathy in that State. But, diligent as defendant obviously has been in the collection of certificates and diplomas, certainly those produced by him neither demonstrate his education "beyond the bare minimum" prescribed by Section 334.040, subd. 2 nor indicate his competence to practice medicine.

■ It is well-established that equity may enjoin acts or conduct constituting a public nuisance [State ex rel. Crow v.

Canty, 207 Mo. 439, 454–459, 105 S.W. 1078, 1082–1084, 15 L.R.A.,N.S. 747; State ex rel. Thrash v. Lamb, supra, 141 S.W. loc. cit. 668(3), 670–671(7); State ex rel. Allai v. Thatch, 361 Mo. 190, 234 S.W.2d 1], defined as "an offense against the public order and economy of the state by unlawfully doing any act or by omitting to perform any duty which the common good, public decency, or morals, or the public right to life, health, and the use of property requires, and which at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons, even though the extent of the annoyance, injury, or damage may be unequal or may vary in its effect upon individuals." State ex rel. Crow v. Canty, supra, 105 S.W. loc. cit. 1080; State by Major ex rel. Hopkins v. Excelsior Powder Mfg. Co., 259 Mo. 254, 278, 169 S.W. 267, 273, L.R.A.1915A 615; Joyce on Nuisances, § 5, p. 10. See also State ex rel. Igoe v. Joynt, 341 Mo. 788, 795, 110 S.W.2d 737, 740(12); State ex rel. Jackson v. Lindsay, 85 Kan. 79, 116 P. 207, 208–209, 35 L.R.A.,N.S., 810; Pomeroy's Equity Jurisprudence (2nd Ed.), Vol. 5, § 1893, p. 4296.

Defendant has arrogated to himself the right to diagnose and treat human ailments and has undertaken the task of examining and caring for that most delicate, intricate and mysterious of all mechanisms—the human body. The live and continuing interest of the State in guarding and protecting the sick and credulous from ignorant and incompetent practitioners is evidenced by the legislative enactments in Chapter 334. Consult State v. Smith, supra, 233 Mo. loc. cit. 268, 135 S.W. loc. cit. 472; State v. Davis, supra, 194 Mo. loc. cit. 499, 92 S.W. loc. cit. 488; State v. Fenter, supra, 204 S.W. loc. cit. 734–735. Without holding that unlicensed medical practice constitutes a public nuisance per se, we are satisfied that the record before us, taken in its totality, conclusively demonstrates defendant's utter inadequacy and incompetence for the role he has assumed and satisfactorily establishes that his extensive and unlicensed practice is, in fact, a public nuisance within the above-quoted definition of that term. So finding, we should not stay the strong arm of equity because there is no specific statutory authorization for injunctive relief against unlicensed medical practice [Burden v. Hoover, 9 Ill.2d 114, 137 N.E.2d 59, 62; State ex rel. Marron v. Compere, supra, 103 P.2d loc. cit. 278(8)] or because defendant might be prosecuted criminally [State ex rel. Crow v. Canty, supra, 207 Mo. loc. cit. 454–459, 105 S.W. loc. cit. 1082–1084; People ex rel. Bennett v. Laman, supra; Boggs v. Werner, 372 Pa. 312, 94 A.2d 50; Heilman, Legal Control of Medical Charlatanism, 22 N.C.L. Rev. 23, 35–36], particularly where, as here, defendant has violated the applicable statutes openly, arrogantly and persistently and also has manifested contempt for the process of the court by examination and treatment of patients while the temporary restraining order was in effect.

The decree of the trial court is set aside and the cause is remanded with directions to enter a decree finding the issues for plaintiff and permanently enjoining defendant in accordance with the prayer of plaintiff's petition.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.