# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00727-CR

**Marcus A. Green, Appellant[1]**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT NO. 9-01-4200, HONORABLE FRED MOORE, JUDGE PRESIDING

## O P I N I O N

Appellant Markus A. Green appeals his conviction of practicing medicine without a license.[2]  Through counsel, he brings five issues on appeal, challenging the legal and factual

---

[1]  Appellant's legal name is Markus A. Green.  In the judgment, he is referred to as "Marcus A. Green."

[2]  Subtitle B of title 3 of the occupations code regulates physicians. *See* Tex. Occ. Code Ann. §§ 151.001-165.155 (West 2004).  "A person commits an offense if the person practices medicine in this state in violation of this subtitle." *Id*. § 165.152(a).  "Practicing medicine" is "the diagnosis, treatment, or offer to treat a . . . physical disease . . . by any system or method, or the attempt to effect cures of those conditions, by a person who:  (A) publicly professes to be a physician or surgeon; *or* (B) directly or indirectly charges money or other compensation for those services." *Id*. § 151.002(a)(13) (emphasis added).  A "physician" is a person licensed to practice medicine in Texas. *Id*. § 151.002(a)(12).

sufficiency of the evidence and one issue concerning closing argument.  He also filed a pro se brief, in which he presents an additional legal sufficiency challenge.  For the reasons stated below, we affirm the judgment of the trial court.

## BACKGROUND

The complaining witness in this case is A.W., a nineteen-year-old woman.  A.W. testified that on July 9, 2001, a man named "Darrell" called her and told her that she had a sexually transmitted disease (STD) and that she needed to come to a health clinic to be tested.[3]  She was told by the person on the phone that she could die from an STD if she were not immediately treated.  A.W. made an appointment with "Darrell," and she and her then-boyfriend, W.G., went to the "Austin Complement Health Clinic" (the "clinic")[4] in the Shoal Creek Medical Building, a professional medical office building.  The clinic contained a waiting room with a table and magazines, chairs upholstered in what appeared to be black leather, end tables, lamps, and a

---

At the time of the offense, practicing medicine in violation of subtitle B was a class A misdemeanor.  *See* Act of May 13, 1999, 76th Leg., R.S., ch. 388, § 1, sec. 165.152(c), 1999 Tex. Gen. Laws 1431, 1527, *amended by* Act of May 23, 2003, 78th Leg., R.S., ch. 202, § 37, 2003 Tex. Gen. Laws 833, 844 (former section 165.152(c)); Tex. Occ. Code Ann. § 165.151(b) (West 2004). A finding that the offender caused psychological harm as a result of practicing medicine without a license enhanced the offense to a third-degree felony.  Tex. Occ. Code Ann. § 165.153(a)(1).  The statute currently makes it a third-degree felony to practice medicine in violation of subtitle B without regard to a psychological harm element.  *See id*. § 165.153(a), (c).

[3] A.W. could not remember whether "Darrell" told her the name of the clinic over the telephone.  However, she testified that he gave her an address and that the clinic she went to was the same as the clinic to which "Darrell" told her to go.  W.G., A.W.'s former boyfriend, identified this person as "Dwayne."

[4] The name of the clinic was labeled on a plaque outside of the clinic door.

2

flowering plant. A framed, poster-sized, dental-health advisory advertisement hung on one of the walls, and the floor was carpeted in a plain gray color.

After A.W. and W.G.'s arrival, appellant appeared wearing a white lab coat and introduced himself to both A.W. and W.G. as "Dr. Markus Green."[5] A. W. had never seen appellant before and had no idea how he obtained her contact information.

Appellant assisted A.W. to complete a standard medical-history form and informed her that she had syphilis. He did not discuss with her how she had contracted the disease or on what basis he formed his conclusion. He then led A.W. to an examination room,[6] which contained tall white cabinets, a small sink and counter with several different types of surgical supplies on top of the counter, several curtained areas, a rolling doctor's stool, a tall lamp, and an examination table. The table was equipped with stirrups, medical wax paper, and utility drawers. On the wall, a sign identified appellant as "Doctor Markus Green." Appellant asked A.W. to disrobe and provided her with a cotton robe. Because she had never been given a full gynecological examination, A.W. did not know what to expect.

Appellant then measured A.W.'s blood pressure. Once A.W. was on the table, appellant pulled open her robe. He used the wooden end of a cotton swab to poke at A.W.'s nipples, examining them for "excess discharge." He did not check her breasts for lumps. Next, he inserted a plastic speculum into her vagina and widened it, to the point of causing her pain. Appellant told A.W. that she had a mild yeast infection that needed to be broken up. He inserted a vibrator into her

---

[5] She acknowledged that appellant never showed her anything specifically identifying appellant as an "M.D."

[6] W.G. remained in the waiting room.

3

vagina and operated it for about three minutes. He then told her that everything else was okay. He did not conduct any tests on A.W., nor did he prepare vaginal slides or ask for a urine sample. He gave her Monistat 7 to treat her "infection." After the examination, A.W. felt awkward and vomited in the bathroom.

After her visit to appellant's clinic, A.W. contacted the Austin Police Department, where she received counseling from a crime victim's counselor. As a result of her encounter with appellant, she said she regularly experienced periods of shortness of breath, headaches, and tingling and numbness in her fingers and body. She also testified that after her experience, she has felt less trusting of people and has had trouble communicating her feelings to others.

W.G. also testified.[7] He repeated the details of the circumstances that led up to A.W.'s appointment with appellant. Appellant would not allow him in the examination room with A.W. From the waiting room, he heard a humming noise, and a few minutes later he heard A. W. vomit. He then went to the examination room and found her "balled up" on the floor and crying. Appellant then spoke with W.G. about STDs and asked him for a urine sample. Appellant tested W.G.'s urine with a test strip and told him that he tested negative for any kind of STD. He then gave W.G. vitamin B6 and other "antibacterial pills."[8] W.G. then went into the bathroom, where A.W. was again vomiting. Appellant also entered the bathroom, and in order to reassure A.W. and W.G.

---

[7] W.G. and A.W. ended their romantic relationship at some point after these events.

[8] W.G. could not remember what these other "antibacterial pills" were. He consumed those pills while at the clinic, and he testified that he "blacked out" briefly on his way home after the appointment.

4

that the clinic was really a doctor's office he illuminated the room with a blacklight to demonstrate that there was bacteria and blood on the walls.

Before A.W. and W.G. left the clinic, appellant told them a cost for the office visit and exam and quoted an additional $45 for the Monistat 7. Because they did not have money with them, appellant said he would mail them a bill. Finally, W.G. testified that following these events A.W. has had emotional problems: "She would start hyperventilating and crying real bad and she'd turn a bright, bright red, and she would just cry for [a] half hour to an hour at a time. Just hyperventilating and crying."

The jury also heard the testimony of A.W's mother, R.W. After the incident, A.W. described her experience to her mother. R.W. attempted on her own to determine whether appellant was a licensed physician. She called appellant's office to request an appointment for an STD exam. Later that evening, she received a phone call from appellant, who identified himself as "Dr. Markus Green." A. W.'s mother asked appellant about his qualifications, and appellant confirmed he was a doctor. He also told her that there were other doctors at the clinic.

Van Nguyen, who worked as an office temporary in the clinic, testified in court. She was placed by her agency at the clinic and worked for appellant for three days in July 2001. When he contacted her for employment, he identified himself as "Dr. Green." He wore a white lab coat and described himself as a "general doctor" who did massages and treated patients with STDs.

An officer from the Texas Board of Medical Examiners testified that appellant was not licensed to practice medicine in this state. A medical-supply store clerk testified that appellant, who identified himself as a doctor and dressed in a lab coat and stethoscope, attempted to purchase

5

medical supplies from the store. A team of officers from the Austin Police Department investigated this case. They found medical supplies, including a hand-held blacklight, a bag of disposable plastic speculums, cotton-tip applicators, urinalysis strips, books on infectious diseases and gynecology, a receipt book, checks in the name of "Dr. Markus Green,"and a box for a "Flex-a-Pleasure" vibrator. They also found a framed certificate from the Massachusetts Medical Society.

Beth Nauert, a licensed physician who has conducted gynecological exams and treated women for STDs, testified as an expert witness for the State.[9]  She explained the proper procedure for conducting a gynecological exam.  Such an exam includes taking a woman's vital signs, examining her breasts for lumps, and examining the genital area for indications of cancer or other diseases. A breast exam consists of examining the entire breast for lumps.  Testing for syphilis requires a blood test, and not a breast or a gynecological exam.  To make an immediate diagnosis of syphilis, one would need at least fifteen minutes and have access to a laboratory to spin blood drawn from the patient.  Furthermore, doctors test for a yeast infection by examining a discharge under a microscope.  The physician testified that she had never heard of using a vibrator to break up a discharge as a form of diagnosis or treatment for a yeast infection or an STD, nor is it common practice to use a vibrator during a gynecological exam.

Appellant testified in his own defense.[10]  He was certified by Travis County to do business as "Austin Complement Health Clinic."  However, he is not a professional in any field in Texas in which he could call himself a doctor.  He planned to make money by screening patients for

_____

[9]  She typically introduces herself as "doctor" and not as a licensed physician.

[10]  Appellant also offered the testimony of several other witnesses.  However, their testimony is not relevant to the issues presented on appeal.

STDs, referring them to a research facility, and receiving commissions from the facilities for placing the individual. He emphasized that he was screening, rather than diagnosing, patients. Appellant further testified that he purchased medical supplies and a roll-around stool "that doctors sit on," and set up an office.

He selected A.W. because he suspected she had "crabs."[11] During a physical examination, appellant testified that he removed one "crab." He admitted that he inserted the speculum into A.W.'s vagina. He stated that she was "tense" and that he used the vibrator in her vagina as "vibration therapy" to relax her muscles. He claimed to have taken a vaginal swab and to have looked at the swab under the microscope for "clue cells." He also decided to conduct a "urinalysis" on W.G. and advised him to see a urologist.

Finally, the record contains almost eighty exhibits, including photographs of the clinic and of equipment used by appellant, notes made about clients of the clinic, lists made by appellant of supplies to buy, and certificates and mail addressed to "Doctor Marcus Green" or "Dr. Marcus Green," among other items.

After a trial on the merits, a jury convicted appellant of practicing medicine without a license, a Class A misdemeanor. The jury further found that appellant had caused A.W. psychological harm, elevating the offense to a third-degree felony. The jury then assessed

---

[11] By "crabs," appellant was apparently referring to crab lice, sucking lice of the classification *Phthirus pubis* that infest the human body in the pubic region. *See Webster's Third New International Dictionary* 527 (1986). Again, appellant did not indicate on what information he based his conclusion.

punishment, enhanced by two previous felony convictions, at forty years' imprisonment. This appeal followed.

## DISCUSSION

### *Fatal Variance*

In his first issue, appellant argues that there was a fatal variance between the pleading and proof. In particular, he asserts that the evidence is legally insufficient to support a finding that he *pretended* to conduct a gynecological exam as alleged in the indictment. He believes instead that the State proved and that the evidence is legally sufficient to show that he *actually* conducted a gynecological exam. He urges that this variance is fatal and warrants a reversal of his conviction. We disagree.

A variance occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial. *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). In a variance, the State has proven the defendant guilty of a crime but has proven its commission in a manner that varies from the allegations in the charging instrument. *Id*. In essence, this is an insufficiency of the evidence problem. *Id*. at 247.

Assuming there was a variance in this case, it was not fatal. A variance is fatal only if it is material and prejudices the defendant's substantive rights. *Id*. at 248. In determining whether a defendant's substantial rights have been prejudiced in this context, we must ask two questions: (1) whether the indictment, as written, sufficiently informed the defendant of the charge against him to allow him to prepare an adequate defense, and (2) whether prosecution would subject the

8

defendant to the risk of being prosecuted later for the same crime under the deficiently drafted

indictment. *Id*. (citing *United States v. Sprick*, 233 F.3d 845, 853 (5th Cir. 2000)).

The indictment in this case charged that appellant

> intentionally and knowingly. . . practice[d] medicine without a license and caused
> another person . . . physical and psychological harm by telling the said A.W. she
> needed to be tested for a sexually transmitted disease and by inserting an object in
> and around her vagina while *pretending to conduct* a gynecological exam, when in
> fact, the said Marcus Green was not a licensed physician, in the State of Texas.

(Emphasis added.) The indictment described the offense by tracking the statutory language[12] and

listed the actions by which appellant allegedly violated the statute. This indictment sufficiently

informed appellant about the crime with which he was charged in order for him to prepare an

adequate defense and satisfies the first *Golihar* prong. *See id*.

Next, appellant was indicted for practicing medicine in violation of subtitle B. *See*

Tex. Occ. Code Ann. § 165.152. Whether he was pretending to conduct an exam or he actually

conducted an exam, he was convicted under evidence relating to the practice of medicine, based only

on his conduct with A.W. on July 1, 2001. This specificity would not allow for a second prosecution

for the same crime under a differently worded indictment. This satisfies the second prong of the

*Golihar* test. *Golihar*, 46 S.W.3d at 248. As a result, in this case the difference between

"pretending to"and "actually" conducting a gynecological exam does not give rise to a fatal

---

[12] *See* Tex. Occ. Code Ann. § 165.152(a).

9

variance.[13]  Because appellant concedes that the evidence is legally sufficient to support a finding that he actually conducted a gynecological exam, we overrule appellant's first issue.

*Legal Sufficiency*

In three issues, appellant challenges the legal sufficiency of the evidence concerning various elements of the offense.  In determining whether evidence is legally sufficient to support a criminal conviction, the reviewing court must view the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *Johnson v. State*, 23 S.W.3d 1, 15 (Tex. Crim. App 2000). We do not examine the fact finder's weighing of the evidence but merely determine whether there is evidence supporting the judgment. *Clewis v. State*, 922 S.W.2d 126, 132 n.10 (Tex. Crim. App. 1996); *Coggin v. State*, 123 S.W.3d 82, 89 (Tex. App.—Austin 2003, pet. denied).

---

[13] Appellant cites *Vineyard v. State* to support his claim.  958 S.W.2d 834 (Tex. Crim. App. 1998).  In *Vineyard*, the defendant was convicted on two charges of child pornography:  for possessing both a *videotape* and a *photograph* depicting a child engaging in sexual conduct.  *Id*. at 835.  The defendant first argued that he was convicted on the two charges in violation of his constitutional protection against double jeopardy.  *Id*. at 836.  He then argued that the statute under which he was convicted did not permit for possession of the videotape and the photograph to count as more than one "allowable unit of prosecution," and thus would not permit two separate convictions.  *Id*. *Vineyard* was a case about double jeopardy and "allowable units of prosecution" under the child pornography statute, and thus is inapplicable to the this case.

***Public Profession of Physician Status and Charging for Services***

In his second issue, appellant asserts that the evidence is legally insufficient to establish that he was practicing medicine because he never "publicly professed" to be a physician. *See* Tex. Occ. Code Ann. § 151.002(a)(13)(A).

When determining whether one has publicly professed to be a physician, it is not necessary to have evidence that one has made a verbal claim to be a medical doctor, a physician, or a surgeon, if what one says and does fall within the definitions of the Texas Medical Practice Act. *Weyandt v. State*, 35 S.W.3d 144, 152 (Tex. App.—Houston[14th Dist.] 2000, no pet.) (quoting *Kelley v. Texas State Bd. of Med. Exam'rs*, 467 S.W.2d 539, 542 (Tex. Civ. App.—Fort Worth 1971, writ ref'd n.r.e.)). That is, a "public profession" depends on what one does, not only on what one says. *See id*. (citing *Smith v. State Bd. of Med.*, 259 P.2d 1033, 1034-35 (Idaho 1953)).

In *Weyandt*, for example, the defendant was listed in the phone book as "Dr. Linda J. Weyandt," and the name of her clinic was "Associated Hypnotherapy and Pain Management Services of Texas." *Id*. at 148. Her name was listed as "Dr. Linda Weyandt" on the clinic's door. *Id*. The clinic itself resembled a typical doctor's office, and hanging on the wall of the reception area were several certificates issued to "Linda J. Weyandt, M.D." *Id*. Although the defendant had earned a doctorate from a medical school in Mexico, she was not licensed to practice medicine in Texas. *Id*. She was, however, a certified registered nurse anesthetist, an advanced nurse practitioner, and a certified hypnotherapist. *Id*.

As part of an undercover operation, a police officer went to the defendant's office, complaining of shoulder pain. *Id*. at 148. The defendant introduced herself as "Doctor Weyandt"

11

and stated that she had "been in anesthesiology" for almost twenty years. She did not clarify that she was not an anesthesiologist, the term for a medical doctor specializing in anesthesia. *Id*. The defendant discussed some possible causes of the shoulder pain with the officer and examined and manipulated her arm. *Id*. The defendant then attached a nerve conduction device to the officer's arm.[14] *Id*. She used the device on the officer until the officer asked her to stop because she was experiencing pain. *Id*. at 149. The defendant then unsuccessfully tried to hypnotize the officer and as the visit ended she suggested that the officer drink an herbal tea. *Id*. Based on these facts, the court found the defendant's conduct during the undercover officer's visit to be legally sufficient evidence that she publicly professed to be a physician. *Id*.

In contrast, not all situations in which a person professes to be a practitioner of the healing arts will constitute publicly professing to be a physician. *See, e.g.*, *Shelton v. State*, 377 S.W.2d 203 (Tex. Crim. App. 1964). In *Shelton*, an investigator from the board of medical examiners went to Shelton's clinic seeking treatment for what the investigator thought was a stomach ulcer. *Id*. at 204. The defendant confirmed verbally that he was "Dr. Shelton." *Id*. He wore a sport shirt. *Id*. He told the investigator that he could treat his ulcer if he would stay at the clinic for six weeks. *Id*. He proposed a six-week fast and said that the witness would have to refrain from smoking. *Id*. He warned the investigator that if he "went to a medical doctor, they would want to cut on [him]." *Id*. The investigator admitted that he knew that the defendant was a Ph.D. and a licensed chiropractor. *Id*. The defendant did not attempt to examine him nor did he prescribe

---

[14] This is a diagnostic device used on a patient under general anesthesia. *Weyandt v. State*, 35 S.W.3d 144, 148 (Tex. App.—Houston [14th Dist.] 2000, no pet.). It has no therapeutic use. *Id*.

anything other than fasting and refraining from smoking. Instead, he provided a letter detailing the prescribed treatment but indicated that his institution was a "Health School" and not a medical institution, and that he did not employ medicines, drugs, serums, vaccines or surgery. *Id*. at 204-05. On those facts, the court concluded that the evidence was legally insufficient to support a conviction because the witness went to Shelton, knowing that he was a Ph.D. and a chiropractor but not a medical doctor. *Id*. at 205.

After reviewing the evidence in the light most favorable to the jury's verdict, we find the evidence is legally sufficient to support a finding that appellant's conduct constituted a public profession of his status as a physician. His "diagnosis" and treatment of an STD he claimed A.W. had contracted, together with the circumstances of the professional-looking waiting room and examination room, his surgical supplies, name of the "health clinic" and the other evidence considered as a whole support the jury's finding. We overrule appellant's third issue.

In his third issue, appellant asserts that the evidence was legally insufficient to show that appellant had directly or indirectly charged money or other compensation for medical services. *See* Tex. Occ. Code Ann. § 151.002(a)(13)(B). Because appellant does not challenge the finding that he practiced medicine and because we have determined that he publicly professed to being a physician, we find that the necessary elements of the statute have been satisfied. *See* Tex. Occ. Code Ann. § 151.002(a)(13). Thus, we need not consider appellant's third issue.

### *Psychological Harm as an Enhancing Punishment Factor*

Appellant, independent of his appellate counsel, filed a pro se brief in which he asserts that the evidence was legally insufficient to find his conduct caused A.W. "psychological

13

harm." *See id*. § 165.153(a)(1). Thus, he argues that enhancement of his punishment to a third-degree felony was improper.

We begin by noting that appellant is not entitled to present his own issue on appeal when his counsel has submitted a brief, a situation termed "hybrid representation." *See Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995). However, in the interests of justice, we will consider the merits of his argument.

At the time of the conviction, practicing medicine in violation of subtitle B was a Class A misdemeanor. Former § 165.152(c). If a fact finder were to determine that a defendant caused another person "psychological harm" when practicing medicine without a license, the offense would become a felony of the third degree.[15] *See* Tex. Occ. Code Ann. § 165.153(a)(1), (b).

Subtitle B of the occupations code does not define "psychological harm." Thus, we must read the phrase in context and construe it according to the rules of grammar and common usage. *See* Tex. Gov't Code Ann. § 311.011(a) (West Supp. 2003); *Garcia v. State*, 887 S.W.2d 846, 859 (Tex. Crim. App. 1994). "Harm" is "physical or mental damage." *Webster's Third New International Dictionary* 1035 (1986). "Psychological" means "relating to, characteristic of, directed toward, influencing, arising in, or acting through the mind especially in its affective or cognitive functions." *Id*. at 1833.

A.W. testified that she felt scared and felt as though she had done something wrong when appellant's office initially contacted her and told her she had an STD. She was told by the person on the phone that she could die from an STD if she were not immediately treated. After the

_____

[15] Subsections 165.153(a)(1) and (b) were never amended.

examination, W.G. found A.W. had vomited and was on the floor, "balled up" and crying. A.W. felt that she had been sexually assaulted. She contacted the Austin Police Department where she received counseling from a crime victim's counselor. After her visit to appellant's clinic, she experienced periodic episodes of shortness of breath and tingling and numbness in her fingers and body. She testified that after her experience, she felt less trusting of people and had trouble communicating her feelings to others.

Given this evidence, we find that a rational trier of fact could have found the presence of "psychological harm" beyond a reasonable doubt. We overrule appellant's pro se issue.

*Factual Sufficiency*

In his fourth issue, appellant argues that the evidence was factually insufficient. In his brief, appellant restates the arguments he made in his challenge to the legal sufficiency of the evidence and the variance between the pleading and the proof. He added no additional argument.

In determining the factual sufficiency of the evidence, we view all the evidence in a neutral light and ask if the proof of guilt is so weak or the contrary evidence so strong as to preclude a rational finding of guilt beyond a reasonable doubt. *Zuniga v. State*, No. 539-02, 2004 Tex. Crim. App. LEXIS 668, at \*20 (April 21, 2004). Evidence supporting guilt can outweigh the contrary proof and still be factually insufficient. *Id*. We review "the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute" and compare it "with the evidence that tends to disprove that fact." *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). Thus, we look at all the evidence on both sides and make a predominantly intuitive judgment. *Id*. We review the fact

15

finder's weighing of the evidence and may disagree with the fact finder's determination. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996).

At the same time, our review must show appropriate deference to the fact finder, and "any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony." *Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996). Absolute deference is not the standard. *Johnson*, 23 S.W.3d at 8. The degree of deference must be proportionate with the facts we can accurately glean from the record. *Id*. We conduct our review mindful of the fact that criminal defendants are not under any obligation to present evidence on their behalf, and the State must prove its case beyond a reasonable doubt. *Id*. at 11.

We have considered the record, including the trial transcripts and the exhibits related to this trial. Given that review and our discussion above of the elements of the offense, we find the evidence factually sufficient to sustain the jury's verdict. We overrule appellant's fourth issue.

### Closing Argument

Appellant presents one final issue. During closing argument, appellant's counsel attempted to assert that a fact finder could not infer the "publicly professed" element from the evidence but that the evidence must be a direct verbal statement. *See* Tex. Occ. Code Ann. § 151.002(a)(13)(A). The court sustained the State's objection that his argument was not a correct statement of the law. On appeal, appellant reasserts his position and argues that the court ruled improperly. Given our discussion above concerning the "publicly professed" element of the offense,

16

we find appellant's argument to be without merit.  *See id*.; *Weyandt*, 35 S.W.2d at 152.  We overrule his final issue.

## CONCLUSION

We find no fatal variance between the indictment and the proof offered at trial.  In addition, we determine that the evidence in this case is legally and factually sufficient to support the conviction.  Finally, we hold that the trial court did not err when it sustained the State's objection to appellant's misstatement of the law in closing argument.  We affirm the judgment of the district court.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   May 27, 2004

Publish

17